## PUBLIC SERVICE GAS COMPANY v. BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL.

Argued April 2, 1913—Decided June 7, 1913.

1. Under section 38 of the Public Utilities act of 1911 (*Pamph. L.,* *p.* 374), the jurisdiction of the Supreme Court is appellate, not original, and the power given is the power to set aside the order of the commissioners, not to make or compel them to make a new order.

2. By section 38 of the Public Utilities act of 1911, the Supreme Court is authorized to set aside an order when it is without the jurisdiction of the board. The jurisdiction to fix rates is limited to cases where the existing rate is unjust, unreasonable, insufficient or unjustly discriminatory or preferential, which facts must be determined by the court according to the whole of the evidence.

3. The presumption in favor of the acts of a judicial or *quasi*-judicial tribunal does not apply with the same force to a legislative tribunal, nor to a tribunal which possesses not only to some extent the powers of a court but also to some extent the powers of a public prosecutor.

4. In determining the justice and reasonableness of a rate for gas fixed by the public utility commissioners, a portion of the territory supplied by the gas company may in a proper case be segregated from the remaining territory. Such segregation is reasonable if it is such as a reasonable man having in view economical and efficient manufacture and distribution would adopt, and just if it is based upon reason and the local situation and not merely arbitrary.

5. A just and reasonable rate when made by compulsion of public authority can never exceed the value of service to the consumer and cannot be made so low as to amount to confiscation; it must ordinarily fall between these two extremes.

6. The Public Utilities act of 1911 authorizes the commissioners to fix just and reasonable individual rates; by this the legislature meant the rate to the individual consumer. If that rate is reasonable, the public service company is allowed to secure such net returns on all its operations as may result from the volume of its business or from its skill in conducting the same.

7. The real test of the justice and reasonableness of an individual rate seems to be that it should be as low as possible and yet sufficient to induce the investment of capital in the business and its continuance therein.

8. In fixing the value of property on which a gas company is entitled to earn a return, it is proper to allow for going value, which includes loss of interest while the plant is in course of construction and while pipe lines are extended, the cost of securing and retaining customers, of encouraging the greater use of gas for fuel and light by the introduction of new and improved appliances, the necessary loss attending experiments, obsolescence of plant apart from the ordinary calculable depreciation which may be charged to current expenses, the expense that attends and the additional value that arises from the uniting of separate companies and the organization of the industry with a view to economical production, and the cost of procuring capital.

9. The special franchises of a public service company are property, but the right of property therein is not absolute but is qualified by the right of the state to fix reasonable rates. In determining the reasonableness of rates, no allowance should be made for the value of the special franchise in a case where it is not legally exclusive and where the state still retains the right to fix rates.

---

On *certiorari*.

Before Justices GARRISON, SWAYZE and MINTURN.

For the prosecutors, *Frank Bergen, Richard V. Lindabury* and *Thomas N. McCarter*.

For the board of public utility commissioners, *Frank H. Sommer*.

For the cities of Paterson and Passaic, *Edward F. Merrey, Albert O. Miller* and *George L. Record*.

The opinion of the court was delivered by

SWAYZE, J. The question is the validity of an order of the board of public utility commissioners fixing the rate for gas

in the territory supplied from the Paterson gas plant at ninety cents per thousand cubic feet. The former rate was $1.10, with a discount of ten cents for prompt payment. This rate the commissioners determined to be unjust and unreasonable. Writs were prosecuted both by the Public Service Gas Company, which claims that the rate fixed is too low, and by the cities of Paterson and Passaic which claim that it is too high. The cities have obviously mistaken their remedy, since the only effect of a judgment in *certiorari* is to set aside an existing order, and if the order is set aside the old rate for gas would remain unaltered. Although therefore all the parties except the public service commissioners unite in asking that the order be set aside, we ought not to do so when it is manifest that that situation results from a mere mistake in procedure on the part of the cities. Under the new Practice act it would be our duty to order new writs and pleadings in order that we might completely and finally hear and determine the whole matter in controversy, and grant the proper remedy, if such a course were now possible. The only remedy that could give the cities the relief they seek is a writ of *mandamus* commanding the commission to reduce the rate below ninety cents. Under well-settled principles this writ is not available. We do not assume in advance to dictate to an inferior tribunal what judgment it shall pronounce. To do so would draw into this court in the first instance the final determination on the merits of a question upon which the parties are entitled to take first the opinion of the inferior tribunal. *Benedict* v. *Howell,* 10 *Vroom* 221; *Mooney* v. *Edwards,* 22 *Id.* 479. The question now involved is not whether upon an application to this court for a *mandamus* to compel a public service corporation to furnish gas, we might not determine for ourselves as an original question what would be a reasonable charge, just as the Court of Chancery determined a reasonable charge for water in *Long Branch Commission* v. *Tintern Manor Water Co.,* 4 *Robb.* 71. The parties do not appeal to our original jurisdiction, but very properly have resorted to the new procedure provided by the legislature in the Public Utilities act of 1911. *Pamph. L., p.* 374. Under that act our

jurisdiction is appellate, not original, and the power given (section 38) is the power to set aside the order of the commissioners not to make or compel them to make a new order. Our original jurisdiction as it has always existed is not and cannot be affected by the legislature, but they may provide as they have in this case a new method of procedure. Since the remedy thus provided is not that which the cities really want, and since no other remedy is now open by which the result they desire can be reached, the writs sued out by them must be dismissed, with costs.

The real controversy in the case arises upon the writ prosecuted by the gas company. Under section 38 we are given jurisdiction to set aside the order of the commissioners when it clearly appears that there was no evidence before the board to support reasonably such order or that the same was without the jurisdiction of the board. On its face this section confers jurisdiction upon this court, but a jurisdiction of a limited character, only to be exercised when it clearly appears that there is no evidence before the board to support their order, or where the order is without their jurisdiction. If this language is taken literally, we should be powerless in any case within the jurisdiction of the board to set aside its order if there was any evidence to support it, no matter how overwhelming the evidence to the contrary might be. It is needless to say that such a literal construction of section 38 would bring it into conflict with our constitution. It needs no act of the legislature to confer on us the power to review the action of an inferior tribunal, and the legislature cannot limit us in the exercise of our ancient prerogative. That the legislature did not intend to do so is made clear by a consideration of the whole act. We are, by the express terms of section 38, authorized to set aside the order when it is without the jurisdiction of the board. The jurisdiction of the board to fix rates is by section 16c limited to cases where the existing rate is unjust, unreasonable, insufficient or unjustly discriminatory or preferential. The only words important for the present case are unjust and unreasonable, since the commissioners themselves went no further in their adjudication.

To determine then whether the commissioners had jurisdiction, we must first determine whether the existing rate was unjust and unreasonable, and in determining that fact we are not limited to the question whether it clearly appears that there was no evidence before the board to support reasonably its order; section 16c does not purport to limit the scope of our inquiry into the fact, and we must therefore determine it in the usual way according to the whole of the evidence. Indeed, section 38 itself makes a distinction between the evidence required to support the order, and that required to sustain the jurisdiction. In the former case the language literally construed would prevent setting aside the order unless there was an absence of any evidence to support it. In the latter case all that section 38 requires is that it should clearly appear that the order was without the jurisdiction of the board. When the legislature in section 38 required that the absence of jurisdiction should clearly appear, it probably had in mind the rule applicable when the court is dealing with the validity of the verdict of a jury upon a rule to show cause, or with the determination of commissioners of assessment as to the amount of special benefits, or the determination of the state board of taxation as to the valuation of property. In these cases there is a presumption in favor of the action of the inferior tribunal because in each case that tribunal is acting in a judicial capacity and may fairly be supposed to preserve a judicial attitude. The same rule has been sometimes applied in rate cases, but with less reason.

The presumption in favor of the acts of a judicial or *quasi*-judicial tribunal does not apply with the same force to a legislative tribunal, nor to a tribunal which possesses not only to some extent the powers of a court but also to some extent the powers of a public prosecutor. A legislative body prescribing a rule for future conduct is not limited by the same considerations of justice as a tribunal required to do justice in accordance with existing rules; and one in the position of a public prosecutor can hardly be supposed to preserve a judicial frame of mind; he is rather in the position of one who is judge in his own cause. Under the Public Utilities act, the

commissioners are given extensive powers of legislation and are given the power of initiating proceedings themselves. The manner in which these powers shall be exercised involves often a consideration of large questions of public policy or business wisdom. For example, in this very case the commissioners have fixed a rate for the Passaic district alone, to the exclusion of all other parts of the state in which the gas company by its charter may operate. Whether it is wise to segregate in this way a thickly settled territory in which gas may be manufactured in large quantity and distributed at comparatively small expense, so as to give the inhabitants of the populous districts the advantage of their density of population, or whether it is wise to determine the rate by a consideration of the facts throughout the territory served as a whole, so that the smaller towns may profit by the economies resulting from business on a large scale, and so that the charge for distribution through miles of pipe where consumers are few may be reduced by entering into an average with the cost of distribution through short lines of pipe where consumers are many, is a question of public or business policy, not a question of law or abstract justice to be tested by fixed rules. In such a case there may perhaps be a fair presumption that the action of the commissioners is dictated by wise policy but hardly that its action is just and reasonable. In addition, disobedience to the order of the commission subjects to a penalty of $100 per day, and in some cases amounts to a misdemeanor, so that the public service company is entitled to the benefit of the ordinary rules that require penal and criminal statutes to be construed strictly. All these considerations lead us to the conclusion that if there is any presumption in favor of the order of the commissioners, it depends, like the opinion of the court of another state, upon the strength of the reasoning by which it is supported. This is subject, however, to the qualification that in legislative action the courts will not merely substitute their judgment for that of a legislative body.

We must, therefore, determine for ourselves upon all the evidence whether the former rate for gas in the Passaic dis-

trict was unjust and unreasonable, and whether the new rate is just and reasonable. The two questions are intertwined. It is true one rate may be unreasonably high and the other unreasonably low, but if the new rate is just and reasonable, the old rate may fairly be adjudged unjust and unreasonable. If the new rate is unjust and unreasonable, the order must be set aside, and the question whether the board had jurisdiction by reason of the injustice and unreasonableness of the old rate becomes of no importance. The practical question for us therefore is whether the rate of ninety cents is just and reasonable.

The first question is whether it was just and reasonable for the commissioners to segregate the Passaic district from the rest of the territory supplied by the Public Service Gas Company, and fix a rate based upon the property of the company and its earnings in that district alone. The gas company is said to be incorporated under a special charter enacted in 1873 by which the Oxy-Hydrogen Company of the United States was incorporated with extremely broad powers and authorized to sell gas anywhere in the state and to lay pipes in all the highways and public grounds. Under this charter the gas company is said to be now supplying two million of the inhabitants of the state all the way from Camden opposite Philadelphia to Jersey City opposite New York. It has acquired the rights of numerous corporations and conducts its business in six divisions. The argument is that in fixing rates all the property, earnings and expenses of the company throughout the state must be taken into account. As we have already said, the question whether dense centres of population shall share the advantage of a lower cost of manufacture and distribution with more sparsely settled sections is a question of public or business policy, and that policy the courts ought not ordinarily to attempt to control by substituting their judgment for that of the commissioners, to whom the legislature has entrusted it. A policy may conceivably be adopted that would neither be just nor reasonable within the meaning of the statute. To take an extreme case, suppose the commissioners should segregate a small district in the

business centre of one of our cities within a short distance of the gas plant and of factories, where the consumption of gas for light, heat and power was very great and the cost of manufacture and distribution very small per thousand cubic feet. A very low rate might be established for such a district, which would render necessary a much higher rate for outlying parts of the same city where the cost of distribution was necessarily much greater and where, if the gas were to be manufactured by a separate plant, the cost of manufacture would be much greater. Such a segregation of the most remunerative sections of a city from the least remunerative would not be just and reasonable. The solution of the question must turn largely upon custom, upon the history of the production and distribution in the territory in question, upon the actual location of the manufacturing part of the plant, upon the size and character of plant at which the greatest efficiency can be secured, sometimes upon the boundaries of the municipality, and sometimes in a country as thickly settled as New Jersey upon the contiguity of different municipalities. The segregation of the territory would be reasonable if it were such as a reasonable man having in view the economical and efficient manufacture and distribution of gas would adopt. It would be just if it was based upon reason and the local situation and was not merely arbitrary. The district fixed by the commissioners was a district formerly supplied by the Paterson, Passaic and other companies, and since 1899 by the Paterson and Passaic Gas and Electric Company. The district is densely populated and the different municipalities have with the increasing population been growing into one another. Substantially, all the commissioners have done is to adopt as a unit a district which had long been treated as such by the owners. As far as appears the district was large enough to secure the advantage of large scale production, and compact enough to secure economical distribution. We think the action of the commissioners in this respect was within the limits of their discretion and was just and reasonable. That there is no objection to a segregation for rate-making purposes is shown by the recent decision of the United States

Supreme Court in what are called the Minnesota rate cases. There the property of a railroad used in intrastate business and the income and outgo from that business were segregated from the property used in interstate business and the income and outgo therefrom. The court sustained the segregation.

The next question is whether the rate fixed was just and reasonable. On the one hand a just and reasonable rate can never exceed, perhaps can rarely equal, the value of the service to the consumer. On the other hand it can never be made by compulsion of public authority so low as to amount to confiscation. A just and reasonable rate must ordinarily fall somewhere between these two extremes, so as to allow both sides to profit by the conduct of the business and the improvements of methods and increase of efficiency.

Justice to the consumer ordinarily would require a rate somewhat less than the full value of the service to him; and justice to the company would ordinarily require a rate above the point at which it would become confiscatory. To induce the investment and continuance of capital there must be some hope of gain commensurate with that realizable in other business; the mere assurance that the investment will not be confiscated would not suffice. Many of the cases in the federal courts and in the courts of our sister states have involved a determination of the confiscatory character of the rate under the fourteenth amendment or similar constitutional provisions. We are not called upon to deal with this constitutional question; we have to do only with the question submitted to our judgment by the legislature, and expressed in the language of the statute authorizing the commissioners to fix just and reasonable individual rates. The word "individual" is important. It connotes more than a mere distinction between the rates of one corporation and the joint rates mentioned immediately thereafter. If the legislation related to railroad rates alone. where joint rates are common, the word "individual" might have a narrow sense pointing to a distinction between the rate fixed by a single corporation and the rate fixed by two or more acting together. The statute relates to all public utility corporations, and the ex-

pression "individual rates" must be equally applicable to all. As applied to gas companies, the words can hardly be meant to point a distinction from joint rates; for a joint rate by gas companies must be a rare occurrence; in the actual situation in this state in 1911 almost inconceivable. We think the legislature must have had in mind the rate to the individual consumer. In cases involving the constitutional question, the whole property used in the particular public service and the net return upon the whole must be considered, and if the whole net return is a fair return for the whole property, there is no confiscation, although some individual rates may be unremunerative. *Minneapolis and St. Louis Railroad Co.* v. *Minnesota,* 186 *U. S.* 257. But where, as in this case, the individual rates must be just and reasonable, the net return upon the whole investment may be less than the ordinary return upon investments involving equal risks (*Covington, &c., Turnpike Co.* v. *Sandford,* 164 *Id.* 578), or may be very much more. *Cotting* v. *Kansas City Stock Yards Co.,* 183 *Id.* 79. With this statutory declaration before us, we may well adopt the language of Lord Selborne in *Canada Southern Railway Co.* v. *International Bridge Co., L. R.,* 8 *App. Cas.* 723: "The principle must be, when reasonableness comes in question, not what profit it may be reasonable for a company to make, but what it is reasonable to charge to the person who is charged. That is the only thing he is concerned with." Lord Selborne expressly reserves the case where the results to the company are so enormously disproportionate to the money laid out as to be some evidence that the charge is unreasonable with reference to the person against whom it is charged. That, however, is a case not now before us. By submitting the question of the justice and reasonableness of the individual rate to the commissioners, the legislature must have meant that if that rate was just and reasonable, the company was to be allowed to secure such net returns on all its operations as might result from the volume of its business, or from its skill in conducting the same. By making the individual rate just and reasonable, one difficulty is avoided that would result from the attempt

to make the justice and reasonableness of the rate depend upon the net result from the whole business; the difficulty is that a well managed, old-established, successful company, paying large dividends, would be compelled to reduce its rates to the disadvantage sometimes of a new rival which, however well managed, might not yet be in vogue, and might be paying no dividends, and thus the natural advantage of the old-established company would be artificially enhanced to the detriment of the new company. This difficulty is indeed less likely to arise in the case of a gas company than in the case of railroads between competing points; but as long as other methods of obtaining light, heat and power are available, the difficulty is not negligible. An illustration is found in the necessity European governments have been under to forbid railroads to reduce their rates to such a point as to deprive public canals of traffic. A just and reasonable rate must allow for possible competition and must be such as will allow the ordinarily well managed or ordinarily well located concern to exist without giving an artificial advantage to the more skillful or better located. There is another advantage which the legislature probably had in mind in requiring the individual rate to be just and reasonable. One of the difficulties in rate cases is to allow properly for a return justly due to superior skill. If rates were to be adjudged just and reasonable in accordance with the net returns upon the whole investment, the skillful, prudent, economical manager would have no advantage over his least skillful and most imprudent rival. The fruits of his skill would be seized for the benefit of the public. So, too, by the adoption of the standard of just and reasonable individual rate, the legislature has met the difficulty that would arise where one company by reason of superior credit due to its greater age, greater vogue or more efficient management, is able to secure capital at a lower rate of interest than another; to base the rate upon net returns on the whole business would either allow the more fortunate company a higher net return or reduce the net returns to the less fortunate company to a point where it would be impossible for it to secure capital.

It was probably for these reasons, perhaps for other reasons also, that the legislature required the *individual* rate to be just and reasonable. The difficulty is that which is always present—to ascertain a standard by which this justice and reasonableness shall be gauged. The necessity of public regulation of rates arises out of the monopoly of the public service company. The unregulated price of the service ceases, except so far as some substitute for the particular service may be found, to be determined by competition, and the individual consumer is unable to contract on equal terms.

Fixing rates by public authority may secure to each individual the advantage of collective bargaining by or in behalf of the whole body of consumers, and result in such a rate as might fairly be supposed to result from free competition if free competition were possible. A just and reasonable rate, therefore, is necessarily rather a question of business judgment than one of legal formula, and must often be tentative, since the exact result cannot be foretold. *Willcox* v. *Consolidated Gas Co.,* 212 *U. S.* 19; *Northern Pacific Railway* v. *North Dakota,* 216 *Id.* 579. Like so many other questions in the law that involve the reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before. That it is not a question of legal formula is shown by the decision that a rate may be reasonable, although it fails to produce an adequate return to the public service company, owing to the fact that business has not developed sufficiently to be remunerative, or to the fact that the plant is on a larger scale than is justified by the present demand. *San Diego Land and Town Co.* v. *Jasper,* 189 *Id.* 439; *Long Branch Commission* v. *Tintern Manor Water Co.,* 4 *Robb.* 71. The real test of the justice and reasonableness of an individual rate seems to be that it should be as low as possible and yet sufficient to induce the investment of capital in the business, and its continuance therein. This also is a business question, and depends on the opportunities that may be offered for more profitable investments and the risk involved. In determining the justice and reasonableness of rates, perhaps no better test can ordinarily

be found than the rates customarily charged in localities similarly situated, although we do not say that even that test is infallible. A table printed in one of the briefs shows that while in some municipalities with a population no larger than that of the Passaic district the charge is less than ninety cents, in others it is as high or higher. Upon the whole we find no reason in the rates charged elsewhere to believe that ninety cents is too high for a community with the population of the Passaic district. Nor do we find the charge too low when compared with other municipalities. As a business question, the price seems within the bounds of a fair chance. It is the price which the president of the company offered to establish in 1916; the commissioners have anticipated the reduction by three years. It is urged, however, on behalf of the company that the fairness of the charge is to be tested by the amount of the company's investment and the average return thereon. This brings us to one of the crucial questions in the case. The commissioners thought a return of eight per cent. on the value of the plant was an adequate return and this does not seem to be disputed. No question seems to be raised about the cost to the company of production and distribution, nor that the business was conducted with proper efficiency. The commissioners undertook to ascertain the present value of the property. The cities insist that only the cost of reproduction should be allowed. We are met with difficulties and valid objections whether we adopt the standard of actual investment, of cost of reproduction or present value. It would be a waste of time for us to go over this discussion. We think it enough to say that the great weight of authority is in favor of the standard of present value. That standard has the sanction of the United States Supreme Court in cases involving the constitutional rights of the companies and is said by that court to be no longer open to dispute under the constitution. *San Diego Land and Town Co.* v. *Jasper,* 189 *U. S.* 439, 442. Since all cases of the kind may come before that tribunal for final adjudication, and its decisions upon the constitutional question would be binding upon us, we ought to adopt the same rule. That it is not quite in-

flexible is shown by what the court has said as to the allowance for the increased value of land. *Willcox* v. *Consolidated Gas Co.,* 212 *Id.* 19, 52. No difficulty of that kind is presented in the present case. There is as usual a difference in the valuation of the physical plant by the company and those employed on the part of the commissioners or the cities. The commissioners accepted neither valuation, but adopted a value above the lowest of all and above the assessed valuation, but less than that fixed by the lowest of the company's experts. Their method was not an exact one, but perhaps the result was as good as could be expected from the variance in the testimony. We should have no more confidence in our own result and are not disposed to disturb theirs.

The controversy turns mainly on the allowance for going value and the refusal to allow anything for the value of the franchise. For going value or cost of developing the business, $1,025,000 was allowed. The cities claim that no allowance at all should be made and their writ was prosecuted to secure the correction of this alleged error. For reasons already stated, we cannot in these proceedings lower the rate fixed by the commissioners, and it would be useless therefore to reject this item of the valuation as counsel for the cities ask. The company insists that there should be allowed about twice as much, including preliminary expenses and cost of development. It is necessary, therefore, to determine first whether any allowance at all for going value is proper. We think both on weight of authority and on reason there should be such an allowance. *National Water Works* v. *Kansas City,* 62 *Fed. Rep.* 853; *Kennebec Water District* v. *Waterville,* 97 *Me.* 185; *Gloucester Water Supply Co.* v. *Gloucester,* 179 *Mass.* 365; *Town of Bristol* v. *Bristol and W. Water Works,* 23 *R. I.* 274; *Norwich Gas and Electric Co.* v. *City of Norwich,* 76 *Conn.* 565; *Omaha* v. *Omaha Water Co.,* 218 *U. S.* 180. The cost of a gas plant includes not merely the loss of interest while the plant is in course of construction and is building up a paying business, but even in the case of an old established plant, for the manufacture and

distribution of a commodity to the use of which the public has become so accustomed that it seems a necessity, there must be loss while pipe lines are extended to await the coming of consumers as the city extends. There is the cost of securing and retaining customers, of encouraging the greater use of gas for fuel and for light by the introduction of new and improved appliances, the necessary loss attending experiments that promise improvement, the obsolescence of plant apart from that ordinary calculable depreciation which may be charged to current expenses instead of being capitalized, the expense that must attend and the additional value that arises from the uniting of separate concerns and the organization of a great industry with a view to economical production, and the cost of procuring capital for the original works or subsequent extensions. What items should be charged to construction; what to business development; how much to current expenses, and how much to permanent investment of capital, are all most important practical business questions. However these questions may be solved, all these expenses must be met. Whether they shall be met at the expense of present consumers by being charged at once to current expenses thus reducing the net return and making necessary a higher rate, or whether they shall be capitalized in whole or in part and constitute a permanent addition to capital, or be capitalized and gradually amortized, are business questions. The legal question is whether these items constitute a going value upon which the company is entitled to a return if the individual rate is to be just and reasonable. To this we answer yes. The argument addressed to us on the other side is that all the so-called going value appears in the valuation of the physical plant at the cost of reproduction; the suggestion is, that unless there was going value, the physical plant would be mere junk, and that the difference between the valuation of the physical plant at its cost of reproduction and its valuation as junk is the true going value. The argument seems to us specious rather than sound. We think that if by value we mean what the economists call exchange value, then a buyer would undoubtedly give more for a plant already

doing a profitable business than for a plant of equal cost, capacity and future possibilities, but without the established business.   To a purchaser the assurance of an immediate return is worth paying for, and we see no reason to doubt the correctness of the ruling of the United States Supreme Court in *Omaha* v. *Omaha Water Co., supra.*   We agree with the view expressed for that court by Mr. Justice Lurton: "That the difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers." It is true that that was a condemnation case and not a rate case, and involved therefore a question of exchange value, and not the question of a fair and reasonable valuation as between a public service company and the public.   The two bases of valuation may properly be different, since upon a sale or condemnation the probability of an assured income and a continuance of the existing rates enters into and affects the exchange value; while in the case of a valuation for the purpose of fixing a rate, the question is what valuation and rate will tempt the investment of capital, and to what extent existing rates may with justice be lowered.   In this view the fallacy of the argument on behalf of the cities is that it requires the investor to suffer all the loss if the enterprise fails and deprives him of the chance of additional gain if the enterprise succeeds; and it fails to allow any recompense for the skill shown in developing and conducting the business, or even for the value of experience, which is proverbially expensive. Even in a business as well established and as necessary as the gas business, there is competition with other methods of obtaining light, heat and power, and there are few of us who have not ourselves had experience of the extension in the use of gas due to the efforts of the company to introduce new appliances.   Moreover, we think counsel for the company are right in their contention that the value of an assembled and united plant may be greater than the total value of the separate parts.   The examples given of the increased value of the New York Central railroad over the value of its constituent parts (*Cleveland Railway Co.* v. *Backus,* 154 *Id.*

439, 444), of the increased value of an express company's property in a single state due to its connection with property of the same company in other states. *Adams Express Co. v. Ohio,* 165 *Id.* 194; 166 *Id.* 185, and the recent case in this court of *West Shore Railroad Co. v. State Board of Assessors,* 53 *Vroom* 37, suffice to illustrate the difference between the value of a whole plant and the sum of the value of its parts. The advantage of large scale production at a single plant over production on a small scale at several plants is too well known to require more than mention, and the getting together of property sufficient for the purpose no doubt may create a real value, which may fairly be allowed for in what is called "going value." We think going value was a proper item to allow. In the absence of specific facts as to the amount actually expended, we do not think the commissioners were required to accept the figures of the experts for the company. The higher figure must have been erroneous since it was based upon the assumption that there would be no return for several years while the plant was building and developing, while it can hardly be doubted that with proper management there would be some return at an earlier stage. One difficulty with all the estimates is that it is hard to separate going value from the value of the special franchise to use the streets. They stand upon a different basis except so far as the special franchises have actually cost something to procure; this cost the commissioners allowed. We think that, upon the whole, they reached a fair valuation. They took thirty per cent. of the structural cost. This seems to be practically conceded to be fair; the difference arises from the fact that their estimate of structural cost was lower than the gas company thinks it should have been. No doubt fair-minded men may differ, but as the commissioners seem to have allowed the actual expenses proved, and permitted the whole to be capitalized, even when paid out as current expenses from current rates, we think no injustice was done in this respect.

The most important controversy is with reference to the allowance for the value of the special franchises. The ques-

tion of the propriety of allowing for the value of special franchises is one not yet settled upon authority. That they are property is well settled. *Monongahela Navigation Co.* v. *United States,* 148 *U. S.* 312; *People* v. *O'Brien,* 111 *N. Y.* 1. Our own taxing laws recognize them as property and tax them accordingly. *State Board of Assessors* v. *Central Railroad Co. of New Jersey,* 19 *Vroom* 146; *West Shore Railroad Co.* v. *State Board of Assessors,* 53 *Id.* 37; affirmed, *post p.* 768. Such franchises, however, are property of a peculiar kind; the right of property in them is not absolute, but is qualified by the right of the state to fix reasonable rates. The difference between an absolute right of property and such a qualified right is well illustrated by a series of cases in the United States Supreme Court. *Los Angeles* v. *Los Angeles City Water Co.,* 177 *U. S.* 558; *Detroit* v. *Detroit Citizens Street Railway Co.,* 184 *Id.* 368; *Cleveland* v. *Cleveland City Railway Co.,* 194 *Id.* 517; *Cleveland* v. *Cleveland Electric Railway,* 201 *Id.* 529; *Vicksburg* v. *Vicksburg Water Works Co.,* 206 *Id.* 496. Where, as in those cases, the rate is fixed the value of the franchise may be calculated upon the assumption of that rate. But where, as in this case, the rate is not fixed and may be changed, there is no stable basis upon which to calculate the value of the franchise, since that value is dependent upon the rate. The rate must indeed be reasonable, but to assume a value for the franchise in order to determine the reasonableness of the rate is to reason in a circle; the value and the rate are mutually dependent, and one must be fixed independently if it is to form a basis for the calculation of the other. *Brunswick and T. Water District* v. *Maine Water Co.,* 99 *Me.* 371. That a special franchise in the absence of an exclusive right, is property only in a qualified sense is the result of the right of the state not only to regulate rates, but also to authorize a municipality to supply itself, and thereby destroy the value of the special franchise. *Hamilton Gas Light Co.* v. *Hamilton City,* 146 *U. S.* 258. This argument is inapplicable where the public service company has an exclusive right. *New Orleans Water Works Co.*

v. *Rivers,* 115 *Id.* 674; *New Orleans Gas Co.* v. *Louisiana Light Co., Id.* 650; *Walla Walla* v. *Walla Walla Water Co.,* 172 *Id.* 1. That is not shown to be the present case. The charter of the Public Service Gas Company (*Pamph. L.* 1873, *p.* 1442) does not purport to create an exclusive right. We do not attribute much force to the argument that the special franchises were a gift from the state. Even if that is so as to the franchises under the Oxy-Hydrogen Company charter of 1873, it may not be so as to the special franchises of the constituent companies now merged in the Public Service Gas Company; they seem to have cost something. When it is said that these franchises were a gift, it is probably meant that the public received little or nothing for them except the obligation which the companies assumed—to perform the public duties for which they were chartered. This obligation may or may not have been a fair equivalent. Probably in the early days when the success of the business was doubtful, the bargain was a good one for the public, while in the later days when gas had become a public necessity and the growth of the municipalities to such a point as to make the business a probable success, was assured, the bargain was a good one for the companies. Assuming, however, that the bargain was always a good one for the companies and that the cost to the companies was always so trifling that the franchises may fairly be regarded in popular language as a gift, it does not follow that the franchise is not a valuable property. The value of property does not depend on the mode by which title is acquired. The whole State of New Jersey was originally given by the King to the Duke of York; it immediately became valuable to him and he was able to sell it to Berkeley and Carteret, who in their turn sold it no doubt at a profit. There is, however, a sense in which the fact that franchises are the subject of gift may be important. The value of a gift to an existing company may be destroyed by a similar gift to a new corporation or other individuals; and it is obvious that in order to determine the wisdom of investing in the enterprise, the new-comers would be under no necessity of seeking a return

upon a franchise for which they were to pay nothing.   Since it is in the power of the state to bring about a supply without compelling the public to pay on the franchise valuation beyond the actual cost of procuring it, it would be likely to do so, and the effect would be to destroy the value of the special franchise of the existing company.   These considerations lead us to the conclusion that logically no allowance should be made for the value of the special franchise in a case where it is not legally exclusive and where the state still retains the right to fix rates.   That is the present case.

We are, however, referred to *Willcox* v. *Consolidated Gas Co.,* 212 *U. S.* 19.   The court in that case did approve an allowance for the value of the special franchise, but it was so far from holding that the valuation of the franchise was always to be included in ascertaining the value of the property upon which the company was entitled to a reasonable return, that it disapproved such a valuation made in the court below. What it approved was a valuation made more than twenty years before, and it was careful to say that the allowance rested upon the peculiar facts of that case, and that its decision could form no precedent in regard to the valuation of franchises generally, where the facts were not similar.   The prosecutors urge that the present case is similar and ask that the value of the franchise as fixed at the time of the merger in 1899, be included in the present valuation of their property.   It is difficult to tell from the opinion in the Consolidated Gas Company case upon what exact ground the allowance was approved.   The court refers to the report of a senate committee of investigation soon after the consolidation of the companies, the recognition for twenty years of the agreement as valid, and the fact that the stock had been dealt in for more than twenty years on the basis of the validity of the valuation and of the stock issued by the company.   Neither of these considerations, however, justify the conclusion that the rates must continue to be so fixed as to make good for all time that valuation.   The report of the senate committee seems to have been a mere report of the facts after consolidation was accomplished, and the fact that the stock was dealt

in upon the basis of the validity of the valuation means no more than that in the general estimation of investors the state was not likely to exercise its power to reduce rates. In fact what the court said on this point was unnecessary to the decision since. the result was to sustain the rate fixed by the commission; that is to say, the court held that the rate fixed was sufficient to yield an adequate return even though allowance was made for the valuation put upon the franchise in 1884. In order to make the case an authority for the contention of the present prosecutor, the rate should have been so low that its adequacy would depend upon whether the valuation of the special franchise was included or excluded. In reality the actual decision seems adverse to the present prosecutor; since the court held that the adequacy of the rate was not to be determined by including in the valuation of the company's property the actual present value of the special franchise. The argument of the present prosecutor drawn from the Consolidated Gas Company case is based on a false premise. The facts of the two cases are not similar. The controlling fact in that case was that the companies had earned such enormous dividends that it was fair to assume that they would be able to earn dividends in the future which would justify the capitalization of the franchises at the amount then fixed. The present case differs. The capitalization fixed in 1899 must have been larger than the amount upon which the companies could then expect to earn a normal return; for when the Paterson and Passaic Gas and Electric Company was leased to the Public Service Corporation in 1903, the latter corporation agreed to pay interest on the bonded debt and a dividend on the stock of one and one-half per cent. for the first year, increasing one-half per cent. a year until the limit of five per cent. was reached. The stock for which the holders were willing to accept one and one-half per cent. in 1903, and five per cent. beginning with 1910 perpetually, could have hardly been worth par in 1899. Nothing is shown to have intervened to reduce its value. We are not called upon to consider the liability of holders of that stock to assessments for unpaid shares. Assuming that

the shares must now be regarded as full paid, their par value is no measure of the value of the franchises in 1899, the date of the merger, as it was in the Consolidated Gas Company case.

We should be the last to adopt a rule that would deprive innocent persons, who had invested in good faith, of a value based upon the law existing at the time of their investment. We recognize that our social order rests upon the *régime* of private property protected as well by solemn constitutional provisions as by the long continued policy of the state, including the policy of the very act under which these proceedings are had, and we ought not, even if we had the power, to undermine that system to the injury of individuals who have invested their earnings in reliance upon its continuance. We are, however, to administer the law as it exists and not to change it because possibly individuals have been unwise or ill advised. At the time of the consolidation of the companies in the Passaic district in 1899, it was well understood that the rates of public service companies were subject to public regulation. If there were any doubt of this at the common law, the doubt was set at rest by the decision of the United States Supreme Court in *Munn* v. *Illinois* (and the other "Granger cases" in 1877), 94 *U. S.* 113. Every stockholder, past or present, in the Paterson and Passaic Gas and Electric Company must be assumed to have taken his stock with knowledge of the law, and the same knowledge must be imputed to every bondholder. He may have thought that the state would not exercise its power to his disadvantage and have paid more for his stock on that account; but the state had done nothing to mislead him. If he depended on the state's inaction, he took the chance of its exercising its power, just as he took the chance of the company's being managed successfully. He acquired his stock not upon the basis of any assurance by the state that the then existing rates would continue, but upon his own estimate of the chances and the future value. That there was no assurance of the continuance of then existing rates is demonstrated by the fact that the company itself has pursued a policy of constant re-

duction. Twenty years ago the charge in this district was $2 per thousand cubic feet. It cannot be that a stockholder could have enjoined the directors from making these reductions because the reductions might affect unfavorably the value of his stock. Yet the legal right of the directors to determine the rate is of no higher character than the legal right of the state. That right would be of no avail if the public service corporation could capitalize its special franchises and insist on the right to a rate which would enable it to pay dividends on that capitalization. As Mr. Justice Holmes has said: "If the franchise is taken to mean that the most profitable returns that could be got, free from competition, is protected by the fourteenth amendment, then the power to regulate is null. On the other hand, if the power to regulate withdraws the protection of the amendment altogether, then the property is nought." *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 *Id.* 655. In that case the court refused to interfere with a rate of ninety cents per thousand feet for gas until its effect had been ascertained by actual trial. We do not mean to say that the amount of securities outstanding is not to be considered in determining the justice and reasonableness of the rate. *Smyth* v. *Ames,* 169 *Id.* 466, holds that they are to be considered. A wise legislative body would not enforce so low a rate as to cause sudden and violent losses to investors, not reasonably to be anticipated, and a rate that would clearly lead to that result would not be just nor reasonable. We are not convinced that such would be the effect of the rate in the present case. The facts that a rate as low or lower has been enforced elsewhere, and that the gas company itself offered to establish such a rate in 1916, are persuasive to the contrary; while the allowance by the commissioners of eight per cent. as a fair return on the present value of the property exceeds the rate which the United States Supreme Court has held to be an adequate return in the gas business, and exceeds by three per cent. the amount agreed to be paid upon the securities of the Paterson and Passaic Gas and Electric Company which, upon the company's own figures, constitute three-fourths of the value of the property.

The questions that some time arise as to the cost of manufacture and distribution, and the proper allowance to be made to meet depreciation of the plant and obsolescence do not arise in this case. It is, however, suggested that the cost of manufacture will probably increase and the net profits be thereby diminished. It may be so, and it ought to be open to the company to apply to the commissioners for a modification of the order when changed circumstances justify it. By that time actual experience of the effect of the reduction of the rate will enable the commissioners to act with more knowledge than is now possible.

We are aware of the grave character of the question with which we have had to deal and of the great injury not only to private interests but to the public at large that may result from error, but the same may be said of any legislative policy in matters of moment. We have dealt with the legal principles underlying the case, but the ultimate question is a question of business, and the results cannot be predicted. In such a case the commissioners ought to move with caution. We think in this case they have done so. The order is therefore affirmed, with costs.