(No. 32311.—

PRODUCE TERMINAL CORPORATION *et al.*, Appellants, *vs.*
ILLINOIS COMMERCE COMMISSION *ex rel.* Peoples Gas
Light and Coke Company, Appellee.

*Opinion filed March 23, 1953—Rehearing denied May 18, 1953.*

WINSTON, STRAWN, BLACK & TOWNER, (GUY A. GLADSON, JOHN P. STALEY, ALEXANDER K. GEMBICK, BRYCE HAMILTON, and CALVIN P. SAWYIER, of counsel,) all of Chicago, for appellants Produce Terminal Corp. *et al.;* ASHCRAFT & ASHCRAFT, of Chicago, (CHARLES H. G. KIMBALL, of counsel,) for appellant Joanna-Western Mills Co.; KNAPP, CUSHING, HERSHBERGER & STEVENSON, JOHN H. HERSHBERGER, and ELBERT A. WAGNER, JR., all of Chicago, for appellants Republic Steel Co. *et al.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (MILTON MALLIN, WILLIAM R. MING, JR., and JORDAN JAY HILLMAN, of counsel,) for appellee Illinois Commerce Commission; DAILY, DINES, ROSS & O'KEEFE, FRANCIS L. DAILY, CLARENCE H. ROSS, JOSEPH H. MUELLER, WILSON & McILVAINE, BENJAMIN H. WEISBROD, W. P. GILBERT, and CHARLES W. BOAND, all of Chicago, for appellee Peoples Gas Light and Coke Co.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an appeal from a judgment of the superior court of Cook County affirming two orders entered by the Illinois Commerce Commission which approved the tariff amendments proposed by The Peoples Gas Light and Coke Company with respect to gas sold in large volume to industries in the city of Chicago on an interruptible or off-peak basis. These tariff amendments provided for an increase of about 30 per cent in interruptible and off-peak gas rates, and for the curtailment of interruptible boiler

fuel service before curtailment of interruptible processing service. Appellants are interruptible and off-peak gas customers adversely affected by such tariff increases. Appellants Produce Terminal Corporation, Swift and Company, and Wilson and Company purchase interruptible natural gas for boiler fuel purposes. Swift and Company and Wilson and Company are meat packers and producers of pharmaceuticals and other related products. Produce Terminal Corporation is a public utility distributing electricity to various industries within the stock yards district of Chicago. Appellant United States Cold Storage Corporation, engaged in the business of general cold storage, car-icing, and ice manufacture, is located in the stock yards district and purchases off-peak gas. Appellant Great Lakes Carbon Corporation is engaged in the business of calcinating carbon and carbon products in the Calumet industrial area of Chicago and purchases off-peak gas. Appellants Republic Steel Corporation and United States Steel Corporation purchase natural gas on an interruptible basis, which is used by them in the processing of steel. Joanna-Western Mills is an off-peak user of gas.

This proceeding was initiated when the Gas Company, which furnishes gas to approximately 1,000,000 customers in Chicago, filed with the Commission on October 5, 1949, certain revised rate schedules proposing to increase the rates charged to its eight interruptible customers and 504 off-peak customers, to become effective on various dates in November, 1949. The Commission, in its discretion and pursuant to section 36 of the Public Utilities Act (Ill. Rev. Stat. 1951, chap. 111⅔, par. 36,) entered an order providing for a hearing concerning the propriety of the proposed tariff amendments and suspended the operation thereof until March 4, 1950, and later further extended the suspension period until September 4, 1950. These appellants and others appeared before the Commission in opposition to the proposed increase in rates and other tariff amend-

ments. On January 11, 1950, the city of Chicago filed a written appearance and petition for leave to intervene in the proceeding, contending both the existing and revised rates were unjust, unreasonable, and discriminatory with respect to the general customers of the company, and that any gas available for sale to interruptible and off-peak users, after the general customers had been supplied, should be regarded as a surplus commodity and its price fixed on a competitive basis with other fuels and the increased revenue applied to a reduction in rates and charges for gas sold to general customers. The city requested a hearing and investigation by the Commission to the end that just, reasonable and nondiscriminating rates for all classes of gas service might be fixed or established by the Commission. The Commission denied the city's petition for leave to intervene, and entered a citation order against the Company initiating a general investigation of the entire rate structure of the Company. That proceeding is now pending before the Commission.

On August 16, 1950, the Commission entered an order in this proceeding determining (1) that it was unnecessary for it to determine the earnings of the Company or the value of all of its property for rate-making purposes because the reasonableness of its overall utility earnings was the subject of investigation by the Commission in another proceeding, (2) that the revised rates were approved and were to become effective on and after August 31, 1950, and (3) that pending the completion of its investigation of the reasonableness of the Company's overall rate structure, all increase in net income resulting from these revised rates be placed in a temporary special reserve to meet special nonrecurring costs of integrating a new prospective supply of gas for its customers.

On petitions by appellants and others, the Commission granted a rehearing. On January 11, 1951, upon and after rehearing, the Commission entered an order to the same

general effect as in its previous order, directing the revised rates to remain in full force and effect. Further petitions for rehearing were denied and appeals were taken by appellants to the superior court of Cook County, where, after consolidation of such appeals, the court entered judgment affirming the orders of the Commission.

The Gas Company is an Illinois Corporation engaged in the business of manufacturing, purchasing, distributing, and selling gas within the limits of the city of Chicago, and has been so engaged since 1855. It is a public utility within the meaning of section 10-3 of the Public Utilities Act. (Ill. Rev. Stat. 1951, chap. 111⅔, par. 10.3.) In the late 1920's all of the gas which the Company sold was either purchased by-product gas or gas manufactured by the Company's own production facilities. A great portion of this was coke-oven gas. Coke ovens must be operated without interruption and hence the Company was obliged to use the same amount of coke-oven gas every day of the year. On warm days when the general firm customers' demand was low, the Company had an excess of gas which could not be used by its general customers. It hit upon the plan of selling this excess gas at "off-peak" rates for customers who would be willing to use gas as an alternate to their regular fuel during the warm periods of the year when the general customers' demands were low. Since these off-peak customers would be required to maintain both their regular equipment for their customary fuel, and also alternate equipment to burn off-peak gas, and because this gas must necessarily meet the competition of other available fuels, it was necessary to set the off-peak rates lower than the rate to general customers.

In 1931 natural gas became available to the Gas Company. This natural gas it mixed with manufactured gas for distribution to its general customers. The rate schedule for this natural gas included a substantial demand charge based on the maximum 24-hour demand in a 12-month

period, as well as a commodity charge based on the quantity of gas actually taken. It was thus advantageous for the Company to take natural gas each day as nearly up to its maximum demand as possible so as to reduce the average cost of gas.

The Company has eight interruptible gas customers. These interruptible users take only natural gas, received through lines unconnected with the mixing facilities or general distribution system of the Company. This interruptible service is divided into two classifications numbered 12 and 13. Classification No. 12 is for the use of gas in steam boilers, and the former schedule of rates thereunder was 12.5, 15, and 19 cents per million B.t.u. Classification No. 13 is for use of gas in billet heating furnaces, soaking pits, lime kilns and/or forges, and/or for any other steel manufacturing, rolling or treating process, and the former schedule provided a rate of 19 cents per million B.t.u. The interruptible customers are subject to curtailment of service if serving them would increase the demand beyond the existing capacity of the company at any given time, processing customers receiving a two-hour notice and boiler fuel customers receiving a 30-minute notice. Under the revised schedules the rates for service classification No. 12 are 17.5, 21 and 23 cents per million B.t.u., and under service classification No. 13 the rate is 24 cents per million B.t.u. One of the incidents of interruptible service is that a customer paying a lower rate is totally interrupted from service before there is any interruption in the service to a customer paying a higher rate.

The revised schedules also increased the rates for gas motor fuel users under service classification No. 8, but none of these customers are involved in this appeal.

On appeal from an order of the Commission to the courts it is provided in section 68 of the Public Utilities Act (Ill. Rev. Stat. 1951, chap. 11⅔, par. 72) that: "The findings and conclusions of the Commission on questions

of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission for and against such rule, regulation, order or decision, or that the same was without the jurisdiction of the Commission." In reviewing an order of the Commission, the courts are limited to a consideration of the questions of whether the Commission acted within the scope of its authority, whether it made findings in support of its decision, whether the findings and decision have a substantial foundation in the evidence, and whether constitutional rights have been infringed by the decision. The statute does not authorize a court to put itself in the place of the Commission and to determine independently the issues presented, or to substitute its judgment for that of the Commission. (*Illinois Central Railroad Co.* v. *Franklin County,* 387 Ill. 301.) The law is well settled in this State that the matter of rate regulation is essentially one of legislative control. The fixing of rates is not a judicial function, thence the right to review the conclusion of the legislature or of an administrative body, acting under authority delegated by the legislature, is so limited. *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209.

It is contended by the appellants that the increased interruptible and off-peak rates are above the maximum reasonable rates, and hence are unlawful. Section 32 of the Public Utilities Act (Ill. Rev. Stat. 1951, chap. 111⅔, par. 32) requires: "All rates or other charges made, demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or for any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge made, demanded or received for such

product or commodity or service is hereby prohibited and declared unlawful."

This court has determined in the *Springfield Gas Co. case* that "The rate established must be just and reasonable, both to the public and to the utility. In *Public Service Gas Co.* v. *Utility Comrs.* 84 N.J.L. 463, 87 Atl. 651, it is said that a just and reasonable rate can never exceed,—perhaps can rarely equal,—the value of the service to the consumer, and on the other hand, it can never be made by compulsion of public authority so low as to amount to confiscation; that a just and reasonable rate must therefore certainly fall between these two extremes, so as to allow both sides to profit by the conduct of the business and the improvement of methods and increase of efficiency; that justice to the consumer, ordinarily, would require a rate somewhat less than the full value of the service to him, and justice to the company would ordinarily require a rate above the point at which it would become confiscatory; that to induce the investment and continuance of capital there must be some hope of gain commensurate with that realizable in other business, and that the mere assurance that the investment would not be confiscated would not suffice. Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment. * * * A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. (*Public Service Gas Co.* v. *Utility Comrs. supra.*) Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before. That it is not a question of legal formula is shown by a decision of the United States Supreme Court in *San Diego Land and Town Co.* v. *Jasper,* [189 U.S. 439, 23 Sup. Ct. 571,] that a rate may be reasonable although it fails to produce an adequate return to

the public service company, owing to the fact that the business has not developed sufficiently to be remunerative or to the fact that the plant is on a larger scale than is justified by the present demand."

It is to be remembered that in the *Springfield Gas Co. case* the court was considering the reasonableness of the entire rate structure of the utility as applied to all customers.

One of the reasons urged by the appellants to show that the increased rates cannot be just and reasonable is that the Commission, in approving the revised schedules, failed to treat the sale of gas to interruptible and off-peak customers as a separate and segregated branch of the company's business. Appellants insist that such segregation is imperative since only the costs of furnishing these services, over and above the cost incurred in providing service to general firm customers, may be considered in determining the reasonableness of these rates. It was determined by the Commission, upon substantial evidence that "the demand created by the general customers in the Chicago area originally made feasible the construction of the facilities used to produce, gather and transport natural gas to that area, and without the continued presence of the general customer market of the company, the off-peak and interruptible customers would not be able to obtain natural gas at prices so low as either the superseded or revised interruptible and off-peak rates." It is more than probable that without the demand of the general firm customers in Chicago, these facilities for supplying natural gas in the area could never have existed at all. The evidence clearly indicates that the interruptible and off-peak services were initiated only for the purpose of providing cheaper and better service to the general firm customers, by disposing of gas on hand over and above the current demand of the general firm customers.

In support of their position that these services must be segregated from the service to general firm customers, in

determining the reasonableness of these revised rates, appellants rely upon *Fleming v. Commerce Com.* 388 Ill. 138, *Illinois Central Railroad Co.* v. *Commerce Com.* 387 Ill. 256, *Mississippi River Fuel Corp.* v. *Federal Power Com.* 163 Fed. 2d 433, and others. None of these cases is controlling in this situation. The Commission has properly determined that the interruptible and off-peak services available here could not exist independently of the general firm services. No statute requires these services to be segregated for the reason that some may be regulated by the Commission and others cannot. All the services of the Company are subject to regulation by this Commission. All of the business of the Gas Company is intrastate—not partially intrastate and partially interstate, requiring segregation for rate-making. The only business in which the Company engages is the furnishing of gas service to all these different customers, and all of the services are performed within the same area—the city of Chicago.

It is appellants' position that the only basis for determining whether the revised rates are just and reasonable, within the purview of the statute, is the incremental cost of furnishing the service to interruptible and off-peak users. They insist that the cost of competitive fuels cannot be considered. Appellants maintain that a formula of allocation based on the segregated costs of interruptible and off-peak service is the only appropriate one. We have above determined that the various services of the Gas Company cannot logically be segregated for the purposes of rate-making. The evidence also discloses that the very purpose in disposing of the excess gas to these interruptible and off-peak users was for the purpose of obtaining the gas at a cheaper rate and to sell the excess at such a profit as would cut the cost of gas and improve the service to the general firm customers. Hence, the additional or incremental costs incurred in providing the interruptible and off-peak services,

must, at least, be compensated—and more—to realize the very purpose of the initiation of these services. The only purpose for which the Gas Company could have offered evidence of the incremental cost of these services was to emphasize the extreme lower limit which these rates might reach—consonant with existing principles of law. However, the costs for a particular service must include not only the specific expenditures, but also a just portion of the expenses incurred for all services of which that in question forms a part. (*Illinois Central Railroad Co.* v. *Commerce Com.; Fleming* v. *Commerce Com.*) It thus seems that each service must provide a fair share of the total returns to the utility, and incremental cost alone is not a sufficient basis. Moreover, without the general customers demand, the facilities might never have existed. These interruptible and off-peak customers participate in the benefits afforded by the availability of gas service in Chicago, hence they must bear with the general customers a reasonable share of the total costs of providing such service and of continuing to furnish it. It is readily evident, therefore, that the rate for these interruptible and off-peak services must be something over incremental costs and an additional amount for the benefits of participating in the services of the Company.

We are here concerned only with rates charged for services demonstrated to be incidental to the main or primary purpose of the utility operation. The fixing of utility rates by public authority is a necessity arising out of the monopoly of the public service companies. The unregulated price of service ceases to be determined by competition, except so far as some substitute for the particular service is found, and the individual consumer is unable to contract on equal terms. Fixing rates by public authority may secure to each individual the advantages of collective bargaining by or in behalf of the whole body of consumers and result in such a rate as might properly be supposed to result if free com-

petition were possible. (*Springfield Gas Co. case.*) The provision of gas service to the general firm customers is a true monopoly of the Gas Company, since those customers rely entirely on the Company for this service and quite generally have no alternate facilities for fuel or power at hand. They are effectively dependent on the services of the Gas Company. Interruptible and off-peak customers necessarily, from the very nature of the service available to them, must maintain stand-by facilities for the use of competing fuels. They either receive service for only a definite period during the year, or are subject to complete interruption of gas service on short notice. While they may acquire their gas supply only from the Company, they are not dependent on that gas service but have readily available alternate supplies of competitive fuels and facilities in which to use those fuels. Thus the same reasons and methods for regulating the rates to general firm customers do not apply to the rates for interruptible and off-peak service. In the latter some measure of competition exists, and its provision is merely incidental to the former. It is commonly recognized, with respect to utility charges, that certain rates are established on a basis which meets competitive conditions in a particular field, rather than on a basis related solely to the costs of providing the particular service. The Federal Circuit Court of Appeals determined that the customers of this Company who purchase gas for industrial use have their rates fixed in the light of some competing commodity or service. (*Natural Gas Pipeline Co.* v. *Federal Power Commission,* 131 Fed. 2d 137.) Since the off-peak and interruptible services were initiated for the purpose of and could attract customers only by providing service at a rate so much cheaper than competing fuels that two fuel systems could be maintained and interruption accepted, it is obvious that the rates fixed for such services can be no higher than the cost of the competing commodities or services. It is undisputed that the super-

seded rates for interruptible and off-peak services were set with an eye to the price levels of competing fuels. The evidence discloses that the price of such competing fuels has since risen considerably, and it is only logical that the rates for interruptible and off-peak gas should be increased in line with the very purpose for which these services were proposed.

Appellants argue that only a fair return on the investment is permitted by the *Springfield Gas Co. case,* and these revised rates allow an unreasonable return on their actual incremental costs. We have here demonstrated that in this kind of situation incremental costs is not the only basis to be considered in fixing these rates. The *Springfield Gas Co. case* was concerned with the entire return received by that company on its total investment, and did not refer to any particular service rendered by that company. The same case emphasized that the particular formula applied to determine the rate was not important so long as the rates were in accord with sound business judgment. It is not necessary here for us to consider whether the total return to the Gas Company is a fair one, since that will be reviewed and adjustments may be made in the general investigation now pending before the Commission. That it is within the power of the Commission to authorize a change in rates without a full hearing and examination to determine the fair return on the fair value of the utility's property has been sustained by this court in *Chicago Railways Co.* v. *City of Chicago,* 292 Ill. 190.

The finding of the Commission that the revised rates and charges filed by the Company and approved in the order entered on August 16, 1950, are just is supported by the evidence and is within the authority of the Commission. It cannot, therefore, be disturbed by this court.

The second issue presented to the Commission was whether the proposed revised interruptible and off-peak rates created an unreasonable difference between such rates

and the existing rates for service to the general firm customers so as to constitute an unlawful discrimination under section 38 of the Public Utilities Act. This issue was raised by the intervening petitions of the appellants insisting that the revised rates discriminated against them because there was not enough difference between the rates proposed for service to them and the substantially higher rate for the very different service to general customers. The Commission found that the new rates were not thus discriminatory. In their briefs before this court appellees declare that appellants have abandoned the position taken by them in their intervening petitions. Appellants vigorously deny that they have ever given up such contention, and argue that all facts, including costs, investment, and rate of return where different classes of service are involved, have to be examined before a determination can be made whether different rates to different classes of service discriminate one against the other. The city of Chicago intervened by petition declaring that the superseded interruptible rates discriminated against general firm customers. The Commission refused to allow the city to intervene, but on the basis of such petition ordered a separate investigation of the general rate structure of the Company, where all rates would be investigated with reference to total costs, total investments, and total returns to the Company. We have above determined that it is proper to determine the reasonableness of certain utility rates without a review of the entire rate structure. It is obvious that the question of discrimination raised by the appellants can be better determined in that general rate investigation now pending before the Commission. Its determination is not, therefore, essential to this proceeding before the Commission.

The appellants also urge that the superior court erred in treating as surplusage the Commission's finding that the former interruptible and off-peak rates were discriminatory. Under section 36 of the Public Utilities Act a utility may

initiate a new rate schedule before the Commission, and the Commission in its discretion may automatically suspend such new rate, in which event the Commission shall establish the new rate proposed or others in lieu thereof which it shall find to be just and reasonable. Nothing is said in section 36 of the act concerning an inquiry into the propriety of the old rate in lieu of which the proposed new rate has been filed. It is generally recognized that findings, recitals or reasoning· in an order of an administrative tribunal which are not of controlling weight and therefore not essential to the validity of its order may be disregarded on appeal as surplusage. *Atchison, Topeka and Santa Fe Railway Co. v. Commerce Com. ex rel. Illinois Coal Traffic Bureau,* 335 Ill. 70; *Moline Consumers Co. v. Commerce Com. ex rel. Chicago, Burlington and Quincy Railroad Co.* 353 Ill. 119.

The Commission was then called upon to decide whether the fact that the supply of interruptible fuel gas would be curtailed under the revised rate schedule before any curtailment of the supply of interruptible processing gas occurred would constitute an unlawful discrimination.

The Commission found that "under revised Service Classification No. 13 the rate for gas for processing purposes is one cent per million British thermal units higher than the rate for gas for boiler fuel purposes in the highest price category under proposed Service Classification No. 12, and all boiler fuel gas service is to be shut off before any service of gas for processing purposes is curtailed," and "the establishment of this service priority was necessary by reason of Paragraph 15, Section II of the General Terms and Conditions of Rate Schedule RI-I of the gas tariff of Chicago District Pipeline Company on file with the Federal Power Commission, effective October 1, 1949, to assure a maximum supply of gas to customers of the Company." Three of the interruptible boiler fuel customers have objected to the revised rates on the ground that not

only should they have the option to take gas at the two lowest revised rates available to boiler fuel customers, but in addition should have the option to take gas at the higher revised rate of 2.4 cents per therm available to processing customers so that their supply of boiler fuel gas will not be interrupted before the supply of processing gas. None of these appellants filed any pleading under section 36 of the Public Utilities Act alleging any unlawful discrimination under section 38 against interruptible boiler fuel customers. The question was raised orally, however, and having raised it these appellants had the burden of establishing it. The Commission found, on the basis of ample evidence, that the service priority was necessary to enable the Gas Company to operate in compliance with the Chicago District Pipeline tariff, and at the same time obtain a maximum supply of gas for its customers. Such appellants made no showing that that tariff was unlawful or unreasonable, if in fact such tariff could be questioned here. There is an insufficiency of evidence to establish that an unjust discrimination exists here between the rates available to interruptible boiler fuel customers and the incidents thereof and the rates established for interruptible processing customers. *Wedron Silica Co.* v. *Commerce Com.* 387 Ill. 581.

We have already determined that these revised rates are just and reasonable. There is now pending before the Commission a general investigation of the complete rate structure of the Company. It was unnecessary for the Commission to make any determination with respect to the overall earnings of the Gas Company in this proceeding. These rates do not depend on total costs or total earnings as a basis of their reasonableness, and such total earnings will be of importance only to the general investigation of the Company's rate system. In order to insure that the increase in revenue brought about by this reasonable increase in these rates does not produce for the Company more than a fair return, it was proper for the Commission

to require that this increase be placed in a special reserve fund. Section 11 of the Public Utilities Act provides that the Commission may prescribe the forms of acccounts to be kept by any public utility.

The Company is engaged at present in obtaining a substantial volume of additional natural gas in order to meet the requirements of general customers unable to obtain service. It is obvious that the Company will incur heavy expenses in integrating this additional supply of gas into its system, and in expanding its facilities to handle this increase in volume. Many of these expenses so incurred, being once paid, will never arise again and have been styled by the Commission as nonrecurring expenses. The reserve fund set up here by the Commission is required to be applied only to the payment of these nonrecurring expenses. Little if any increased revenue will be obtained by the Company, due to these expenses not being met from the rate payments of general customers. Such high nonrecurring expenses would necessarily have to otherwise be met by an increase in general firm customer rates. Thus the general firm customers will receive the benefit of this impounded fund while the general investigation of the Company's rate structure progresses, with little increase in revenue to the Company. Appellants assert that this action by the Commission was an invasion of the province of management. If management does not object to this alleged "invasion," certainly appellants may not be heard to do so. *Public Utilities Com. ex rel. Mitchell* v. *Chicago and West Towns Railway Co.* 275 Ill. 555.

It is thus evident, upon all errors urged by appellants, that the Commerce Commission acted within the scope of its authority, that its order has substantial foundation in the evidence, and that no constitutional right has been infringed by fixing confiscatory or insufficient rates. The revised rates for the interruptible and off-peak service are just and reasonable. The order of the Commission cannot,

therefore, be set aside by the court. The judgment of the superior court in affirming the order of the Commission is affirmed.

*Judgment affirmed.*

Mr. JUSTICE DAILY took no part in the consideration or decision of this case.