XTRA CORPORATION *et al.*, Plaintiffs-Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellants (Commonwealth Edison Company, Defendant).

First District (1st Division)   No. 86—0136

Opinion filed May 18, 1987.—Rehearing denied June 18, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos and Edward P. O'Brien, Special Assistant Attorneys General, of Chicago, of counsel), for appellant Illinois Commerce Commission.

Mayer, Brown & Platt, of Chicago (Robert M. Berger, Stephen J. Mattson, and Rosanna A. Marquez, of counsel), for appellant Transamerica Transportation Services, Inc.

Kirkland & Ellis and Daniel L. Houlihan, both of Chicago, and J. Robert Lajoie, of Boston, Massachusetts (Tefft W. Smith and J. Andrew Langan, of counsel), for appellee.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook County reversing an order entered by the Illinois Commerce Commission (Commission) that had approved a proposed sale of certain real estate owned by Commonwealth Edison Company (Edison) to Transamerica Transportation Services, Inc. (Transamerica).

The issue presented on appeal is whether the Commissioner's findings were, as determined by the circuit court, against the manifest weight of the evidence and, hence, properly reversed by the trial court. For the reasons set forth below, we find that they were not and, therefore, reverse the judgment of the circuit court.

The subject matter of this appeal is Edison's Crawford terminal site, approximately 37.5 acres of real estate, located near the intersection of 35th Street and Pulaski Road in Chicago, Illinois. Edison originally purchased the property in 1972 for its future needs. In 1982, Edison determined that it did not need the property, declaring it to be "excess." Pursuant to a lease agreement, X-L-Company, Inc., a subsidiary of XTRA Corporation (XTRA), occupied 15 acres of the property. Subsequent to declaring the land to be excess, Edison began to look for a potential buyer. Edison offered to sell the 37.5 acres to XTRA for $3.025 million. XTRA expressed interest in the property, specifically the 15 acres currently leased, but rejected Edison's offer. Edison also placed two ads in an industrial journal and sent letters to occupiers of nearby properties indicating that the property was for sale with an asking price of $3.28 million.

In early 1983, Edison told XTRA that no third parties were interested in the property. In February of 1983, Edison offered to sell 21 acres to XTRA for $1.8 million; the 21 acres contained the 15 acres currently leased. In the alternative, Edison offered to sell the 37.5

acres to XTRA for $2.45 million. XTRA counteroffered to purchase the 15 acres for $1 million. In March, Edison informed XTRA that it lowered its asking price for the 37.5 acres to $2.4 million. Edison also informed XTRA that another party was interested in the property. Again, XTRA renewed its million-dollar offer to purchase the 15 acres; Edison rejected the offer.

In January of 1984, Edison and XTRA commenced negotiations to renew the lease for the 15 acres. In addition to a rent increase, the final agreement contained a new provision which would permit either party to terminate the lease upon 90 days' written notice. A copy of the new lease was executed by XTRA on May 15, 1984. Pursuant to section 27 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 27), Edison filed a petition with the Commission seeking approval of the new lease with XTRA.

In March of 1984, Edison met with Transamerica regarding Transamerica's possible purchase of the 37.5 acres. Transamerica is XTRA's competitor. On March 21, Transamerica verbally agreed to purchase the property for Edison's asking price of $2.75 million. This agreement was conditioned upon the results of soil and engineering tests, approval by Transamerica's board of directors, and approval by the Commission. Additionally, despite this tentative agreement with Transamerica, Edison continued to negotiate the terms of the new lease with XTRA, and Edison's representatives were instructed not to inform XTRA during the lease negotiations of the proposed sale to Transamerica. Edison and Transamerica then executed a written sale agreement on May 29.

In June of 1984, XTRA was informed by Edison's in-house counsel of the May 29 agreement between Edison and its competitor. XTRA then submitted an offer to purchase the 37.5 acres for $2.85 million with a $50,000 cashier's check as earnest money. This offer surpassed Transamerica's offer by $100,000. Edison rejected XTRA's offer based upon its agreement with Transamerica and, on July 3, filed a second section 27 petition with the Commission seeking approval of the proposed sale to Transamerica. XTRA then renewed its offer, sending Edison a new contract and a new $50,000 cashier's check. Thereafter, XTRA filed a petition pursuant to section 27.01 (Ill. Rev. Stat 1983, ch. 111²/₃, par. 27.01) for relief and seeking approval of its offer to purchase the property for $2.85 million.

The three petitions were consolidated and, subsequent to a hearing, a majority of the Commission gave the Commission's consent and approval to the proposed Transamerica sale and the XTRA lease after finding that the sale and lease were reasonable, were in the public in-

terest, and would convenience the public. After reviewing the record here, the majority of the Commission was of the opinion that XTRA's rights and equities under section 27.01 were not violated in light of XTRA's numerous opportunities to purchase the property. The majority also specifically approved an Edison accounting procedure that required that the minor loss from the proposed sale be recorded in Edison's books so as not to affect Edison's rates. While the Commission also observed, in its written opinion, that it naturally desired that Edison maximize the proceeds from the sale, it stated that it would not upset one transaction to encourage another for a relatively comparable amount of money. One Commissioner, while concurring with the order, stated in a separate opinion that in his judgment XTRA was guilty of extremely poor business judgment in losing a valuable piece of property, but that the "good faith" normally accompanying real estate transactions was also lacking here, and that Edison sacrificed its sense of fair dealing in order to generate income from the 37.5-acre site. Two Commissioners dissented, claiming that the majority had erred by failing to give due weight and consideration to the most fundamental reason for denying Edison's position, *i.e.*, that "Edison simply did not receive the 'best possible price' for the parcel giving due consideration to a higher competitive bid."

XTRA filed this action in the circuit court of Cook County seeking judicial review of the Commission's decision. The trial judge adopted the dissenting opinion filed by the two Commissioners and reversed the Commission's order as being contrary to the manifest weight of the evidence. Specifically, the trial court found that the Commission acted contrary to the law in its consideration of the equities and rights of XTRA as a tenant in possession under section 27.01 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 27.01). The court also said that the Commission totally disregarded the interest of the public in not securing the highest price for this property so as to ease the burden on Edison's customers. Both the Commission and Transamerica have appealed the circuit court's decision.

■ In reviewing the action taken by the Commission, the circuit court is limited to considering " 'whether the Commission acted within the scope of its authority, whether it made [proper] findings *** and whether constitutional rights have been infringed by the decision.' " (*Citizens Utilities Co. v. Illinois Commerce Com.* (1971), 50 Ill. 2d 35, 39, 276 N.E.2d 330, 332, quoting *Produce Terminal Corp. v. Illinois Commerce Com.* (1953), 414 Ill. 582, 589, 112 N.E.2d 141, 144.) Additionally, under section 68 of the Public Utilities Act:

"The findings and conclusions of the Commission on questions

of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission ***." Ill. Rev. Stat. 1983, ch. 111²/₃, par. 72.

In deciding whether to approve a public utility's sale of real property, the Commission is to determine whether the petition seeking approval of the sale "should reasonably be granted, and that the public will be convenienced thereby." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 27.) As the court stated in *Klopf v. Illinois Commerce Com.* (1977), 54 Ill. App. 3d 491, 369 N.E.2d 906:

"[I]n considering whether a proposed sale of property by a public utility ought to 'reasonably' be granted *** '[t]he Commission *** has been given one constant factor to consider; namely, that the public will be convenienced by the approval of a particular transaction under its consideration. Once it is satisfied that such is the case, and that the particular transaction should reasonably be granted it will give its approval.' " 54 Ill. App. 3d 491, 498, 369 N.E.2d 906, 911, quoting *Chicago & North Western Ry. Co. v. Illinois Commerce Com.* (1970), 130 Ill. App. 2d 352, 361-62, 264 N.E.2d 745, 751.

In *Illinois Power Co. v. Illinois Commerce Com.* (1986), 111 Ill. 2d 505, 490 N.E.2d 1255, the supreme court determined that the "public-convenience standard" should not be construed to prohibit the Commission from considering alternative proposals which may be more advantageous and more preferable for the public convenience. There, the Commission denied Illinois Power's petition seeking approval of its acquisition of a smaller utility company. The Commission compared Illinois Power's acquisition proposal with that of another utility company seeking to acquire the same company, and it concluded that a merger of Illinois Power with the small company would not be consistent with the public interest. The circuit court affirmed, but the appellate court reversed, holding that the Commission's restriction of its examination of Illinois Power's petition to a comparative analysis deprived Illinois Power of its statutory right to be evaluated on its own merits through offering evidence of the public convenience and benefits of its proposal. (*Illinois Power Co. v. Illinois Commerce Com.* (1984), 127 Ill. App. 3d 937, 941, 469 N.E.2d 347, 350.) The supreme court reversed the appellate court holding that it was within the Commission's discretion to consider alternative proposals and found that the Commission's findings were not against

the manifest weight of the evidence. 111 Ill. 2d 505, 513, 516, 490 N.E.2d 1255, 1258, 1260.

In *Klopf v. Illinois Commerce Com.* (1977), 54 Ill. App. 3d 491, 369 N.E.2d 906, the Commission voided a sale of a portion of a former railroad right-of-way to a consortium of adjacent landowners and, additionally, authorized the Illinois Department of Conservation to acquire the property either by purchase or by condemnation proceedings. The circuit court found that the Commission's findings were against the manifest weight of the evidence and reversed. On appeal, the appellate court disagreed, finding that the Commission's findings were sufficiently supported by the record. The appellate court said it could not state that the Commission's order denying the sale was against the manifest weight of the evidence or contrary to the Commission's legislatively created authority and, therefore, reversed the circuit court and affirmed the Commission.

■ Here, the Commission's decision is adequately supported by the evidence presented in the record. There is evidence that Edison would suffer a loss under both the Transamerica and XTRA deals. Furthermore, any resulting loss from the sale of the property, under the Commission's order, would be recorded in the company books in such a way that the loss would be borne by Edison's shareholders and not by Edison's customers. Thus, we find that, under the circumstances, the Commission's findings that the public would be convenienced by the sale to Transamerica and that the additional $100,000 offered by XTRA (particularly in light of the manner in which it was made) was not a sufficient reason to disapprove the sale to Transamerica are not against the manifest weight of the evidence. Furthermore, such findings are not repugnant to the purpose and duty of the Commission, *i.e.*, "to assure that efficient and adequate utility service is provided to the public at a reasonable cost." *Village of Hillside v. Illinois Commerce Com.* (1982), 111 Ill. App. 3d 25, 31, 443 N.E.2d 710, 715.

This case also presents an issue regarding the scope of a tenant in possession's "rights and equities" under section 27.01. Section 27.01 provides:

> "In a proceeding before the Commission in which the consent and approval of the Commission to the sale, lease or other disposition of any real property owned by a public utility is sought, any tenant in possession who has been in possession of such property for more than 5 years and who has made substantial improvements to the property has standing to appear and offer evidence to the Commission with respect to the pro-

posed disposition, and the Commission, in making its determination, shall consider the rights and equities of such tenant in possession." Ill. Rev. Stat. 1983, ch. 111²/₃, par. 27.01.

It is apparent from the separate opinions of the Commission that the Commission itself was not quite sure of the extent of those rights. The majority found that XTRA's rights and equities were not violated under the circumstances. However, the dissenters noted that Edison was selling the property out from under a good tenant without permitting the tenant to make a competitive bid. Whatever the extent of a tenant's "rights and equities" under section 27.01, the majority's interpretation of section 27.01, *i.e.*, that XTRA's rights and equities were not violated here since it failed to take advantage of numerous opportunities to acquire the property, is supported by the record. XTRA had opportunities to purchase the property from Edison for a period of two years before Edison approached Transamerica. The asking prices contained in Edison's offers to sell the 37.5 acres to XTRA were, at times, far below what both Transamerica agreed to pay and XTRA offered after learning of the proposed sale to Transamerica. This court should defer to the Commission's interpretation since the agency is in a better position to make an informed judgment based upon its experience and expertise. (See *Illinois Consolidated Telephone Co. v. Illinois Commerce Com.* (1983), 95 Ill. 2d 142, 447 N.E.2d 295.) Furthermore, we do not find, in any event, that the statute gives the tenant in possession an absolute right of first refusal.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed, and the cause is remanded with directions to affirm the decision of the Commission and for any necessary further proceedings consistent with this opinion.

Judgment reversed and remanded.

CAMPBELL and BUCKLEY, JJ., concur.