THE PEOPLES GAS LIGHT AND COKE COMPANY *et al.*, Petitioners-Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

First District (5th Division) Nos. 86—1802, 86—1826 cons.

Opinion filed September 11, 1987.—Rehearing denied February 1, 1988.

James Hinchliff, Gerard T. Fox, and Matthew A. Greene, all of Chicago, for appellants Peoples Gas Light and Coke Company and North Shore Gas Company.

Defrees & Fiske, of Chicago (Edward J. Griffin and W. Michael Seidel, of counsel), for appellant Central Illinois Light Company.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos, Edward P. O'Brien, and Douglas W. Trabaris, Special Assistant Attorneys General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Stefan H. Krieger, of Edwin F. Mandel Legal Aid Clinic, of Chicago, for appellees South Austin Coalition Community Council, Action Coalition of Englewood, and Northwest Community Organization.

JUSTICE MURRAY delivered the opinion of the court:

This is a consolidated review of an order of the Illinois Commerce Commission (Commission) involving a utility program known as the Illinois Residential Affordable Payment Plan (IRAPP) and the Illinois Energy Assistance Act. The review came direct to this court from the Commission by reason of section 10—201 of the Illinois Public Utilities Act (IPUA) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201) and Illinois Supreme Court Rule 335 (107 Ill. 2d R. 335). The petitioners are the Peoples Gas Light and Coke Company (Peoples) and North Shore Gas Company (North Shore), case No. 86—1802 and the Central Illinois Light Company (Central), case No. 86—1826.

Although there were a large number of respondents in the matter before the Commission, only four have filed briefs in this appeal. The four are: the Commerce Commission, South Austin Coalition Community Council, Action Coalition of Englewood, and Northwest

Community Organization (the community organizations).

The review involves the following statutes and rules:

(1) the Illinois Energy Assistance Act (Act) (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1301 *et seq.*);

(2) the Illinois Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1—101 *et seq.*); and

(3) rules of the Illinois Administrative Code implementing the IEAA (83 Ill. Adm. Code 280, 281 (1985 & 1986)).

The IEAA became effective on November 22, 1985. The intent of the Act as expressed in the Act "is to ensure that (certain) citizens are able to reasonably afford an essential level of heating and electric service without jeopardizing the ability of utilities to receive just compensation therefor." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1302.) The Act authorized and directed the Commission to "institute a program designed to ensure the availability and affordability of heating and electric service to low income citizens." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1304.

The IEAA authorized and directed the Commission to promulgate rules, regulations, and decisions to effectively implement the program. Additionally, the Act also provided for a conservation and weatherization program designed to effectively reach all low income customers within four years. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1307.) To implement the above programs, certain administrative rules were proposed and revised. A final version of the rules was adopted by the Commission by order entered April 23, 1986. The Commission denied petitions for rehearing and these appeals by three utility companies, Peoples, North Shore, and Central, followed.

Peoples and North Shore contend that provisions of the rule adopted for the programs provided for by the IEAA violate section 4 of the Act (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1304(f)) because section 281.30(b) of the promulgated rule (83 Ill. Adm. Code 281 (1986)) does not require persons participating in the IRAPP program to pay for energy usage above average residential usage in order to avoid being removed from the IRAPP program and having their service disconnected. They also argue that the provision relating to the IRAPP program concerning the resumption of participation after disconnection and default (83 Ill. Adm. Code 281.70(b) (1986)) is not supported by substantial evidence as required by section 10—201 of the IPUA. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv)(A).) Section 10—201 requires that a finding of fact of the Commission be supported by "substantial evidence." Finally, they argue that the IRAPP program violates both the IPUA and the IEAA.

Central argues that portions of the Commission's rule implementing the IRAPP program authorized by the IEAA are arbitrary, unreasonable, capricious, and void. They argue that the Commission's definition of shortfall violates the IEAA. Shortfall is defined by the Commission as the difference between payments actually made by a participant and the actual amount incurred for the utility service provided. Central asserts that the rules for the IRAPP program erroneously limit customer payments to less than 12% of household income. Central also contends that the rules implementing the IRAPP program fail to comply with requirements of the IEAA that low income customers pay for usage in excess of average residential use.

By its order of April 23, 1986, the Commission adopted administrative rules (83 Ill. Adm. Code 281 (1986)) (hereinafter referred to as rule) with changes reflected in an appendix of its order and directed that the rule as changed be adopted as a rule under section 5.01(c) of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1985, ch. 127, par. 1005.01(C)). The rule, which is 24 pages in length, parts of which are attacked by Peoples, North Shore, and Central, provides for an IRAPP program. It provides for definitions, applications to participate by those eligible, provisions for payment of utility bills during the winter months (December 1 through April 30), elimination of shortfall, customer default and disconnection, late payment charges, conservation, and weatherization. It even provides for a sunset date of January 1, 1989.

Rather than setting out the provisions of the lengthy rule establishing the IRAPP program, the court in this opinion will merely describe those portions of the rule objected to by Central, North Shore, and Peoples in this appeal. The rule requires a participant in the program to pay 12% of his monthly income during December 1 through April 30 to the Utility that provides the customer's primary source of heat and secondary utility service, with alternative provisions for secondary service. During the period from May 1 through November 30, the customer is required by the rule to pay the greater of that percentage of his/her income required during December 1 through April 30 (12%, etc.) or the current bill, plus one-fifth of any outstanding deposit (the deposit, if required, is payable during the months of May through November). By the terms of the rule, any customer who complies with the payment requirements shall not have his or her public utility heating or electric service terminated. Ill. Adm. Code 281.30(b) (1986).

Peoples and North Shore argue that the Commission rule violates the IEAA because it does not require those who participate in the

IRAPP program to pay for energy usage above "average residential usage" to avoid being ousted from the program and having their gas and electrical energy shut off. Average residential usage is determined by the use for the same month in the preceding year adjusted for weather and household size. Peoples and North Shore argue that this shortcoming is contrary to the Governor's veto message, which indicated that the vetoed original IEAA should have required participants in the program to pay for all energy usage above the average residential use to encourage conservation of energy.

■ The meaning of a statute in the first instance is determined by the statutory language and, where the intent of the legislature can be ascertained from the language of a statute, it will be given effect without resorting to other aids of construction. (*People v. Robinson* (1982), 89 Ill. 2d 469, 475-76, 433 N.E.2d 674.) The Governor's amendatory veto message accepted by the legislature only required participants in the IRAPP program "to pay for all energy usage above the average residential usage." "This will encourage the conservation of energy," the Governor stated. The final version of the IEAA requires customers participating in the program to pay for all energy usage above average residential use adjusted for weather and household size unless the customer has a certified medical excuse. Ill. Rev. Stat. 1985, ch. 111⅔, par. 1307.

Neither the Governor's veto message nor the IEAA subsequently enacted provides for an immediate termination of service and ouster from the program if a particular participant fails to pay for energy usage above the average residential use adjusted for weather and household size, provided the customer complies with the payment provisions of the Act.

■ The Commission's rule expressly calls for the payment of above-average energy bills by participants. (83 Ill. Adm. Code 281.30(c) (1986).) Although the rule does not mandate a termination if immediate payment is not made, neither does the Governor's veto message nor the IEAA. During the months of May through November participants must pay the greater of 12% of monthly income or their current bill, plus 20% of the outstanding balance of any required deposit. (83 Ill. Adm. Code 281.30(a)(1)(B) (1986).) The participants who fail to pay the original amount for services provided during the months of December through April (12% of the monthly household income to the customer's primary source of heat and secondary service or other prescribed percentages where more than one utility is providing secondary utility services) and their monthly bills, plus the current bill, plus 20% of any outstanding deposit, subjects

the participants to removal from the program and a discontinuance of service. This delayed remedy for nonpayment of above-average energy use from the cold months to the warm months comports with the concept of the Act limiting payment of utility bills to a manageable percent of income during the cold months and a payment of the full bill, plus any deficiency, in the warm months. It encourages a participant to conserve energy during the months his/her payments are fixed to the income received or otherwise take the risk of bigger bills in the warm months that are not tied to a percentage of income. This provision comports with both the Act and the concept of an incentive to conserve energy. The court concludes that the Commission's adopted rule is consistent with the wording and intent of the IEAA legislation, insofar as participants' payments for excess residential energy are concerned.

As their second issue, Peoples and North Shore argue that the provision in the rule allowing participants in the program to resume participation in the program after disconnection for default is contrary to the intent of the IEAA and unsupported by substantial evidence as required by the IPUA, and thus, requires remandment for a more stringent rule in cases of defaulting participants.

Under the provisions of the rule establishing the IRAPP program, a participant who defaults may, before disconnection, be reinstated by paying all amounts due and can be reinstated two times in any 12-month period. (83 Ill. Adm. Code 281.70(a) (1986).) A defaulting customer who is disconnected shall, within 90 days of disconnection, have only one opportunity to be reconnected in any 12-month period and to participate further in the program. (83 Ill. Adm. Code 281.70(b) (1986).) In order to be reconnected, a customer must comply with the applicable reconnection provisions contained in section 280.83 Ill. Adm. Code 280 (1985).

North Shore and Peoples do not indicate anything in the record to support their claim that this rule permitting resumption in the IRAPP program after default is too liberal. They argue that the rule could be abused by IRAPP participants letting themselves be disconnected in the spring or summer and then seeking reconnection in the fall under the Commission's special winter rules. See 83 Ill. Adm. Code 280.138 (1986).

■ The provisions of public utility law relating to appeals directed to this court (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201) do not change the scope of judicial review of a Commerce Commission rule. The law is well settled that a court is not authorized to put itself in the place of the Commission to determine independent issues

presented or to substitute its judgment for that of the Commission. (*Forest Preserve District v. Illinois Commerce Comm'n* (1957), 12 Ill. 2d 319, 323-24, 146 N.E.2d 27.) In line with this concept, it is not the function of the court to enter upon an independent investigation of evidence to develop facts not found by the Commission. *Schussler v. Illinois Commerce Comm'n* (1951), 410 Ill. 289, 294, 102 N.E.2d 101.

■ North Shore and Peoples do not point to a single bit of evidence that the provision for reinstatement into the program after being disconnected has been or will be abused. Absent some evidence of abuse, this court cannot conclude that the portion of the rule permitting two opportunities for reinstatement or one chance to be reconnected in a 12-month period is unreasonable or unsupported by the evidence. Absent evidence indicating the inability of the utilities to receive just compensation for their services because of the rule, this court must conclude that the rule falls within the intent of the IEAA, *i.e.*, to ensure that citizens who cannot afford full payment for essential utility services due to economic circumstances are able to reasonably afford an essential level of heating and electric services. Ill. Rev. Stat. 1985, ch. 111⅔, par. 1302.

North Shore and Peoples also contend that the Commission's IRAPP rule relieving participants from late payment charges (83 Ill. Adm. Code 281.80 (1986)) violates both the IEAA and the IPUA. The utilities direct our attention to an order of the Commission dated September 21, 1983, docket No. 82—0591, adopting uniform rates for late payment charges, and to a Commission rule (83 Ill. Adm. Code 280.110 (1986)) which authorizes late payment charges to customers who have entered a deferred-payment agreement. The effect of the rule relieving IRAPP participants from paying late payment charges precludes the utility from recovering the time cost of money relating to amounts for prior periods which remain unpaid (*e.g.*, arrearages, shortfall, unpaid monthly obligations, and unpaid amounts representing excessive consumption). The utilities argue that this violates the IEAA, which does not exempt IRAPP participants from late payment charges, and thus additionally burdens other customers. The utilities also contend that this preference ·is contrary to that provision of the IPUA prohibiting discrimination among customers. Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—241.

It is true that the IEAA does not exempt IRAPP participants from paying late payment charges. On the other hand, no provision of the IEAA precludes the exemption. Moreover, the utilities have not indicated any provision of the IPUA that authorizes or mandates

late payment charges. They do point to a rule of the Commission that permits such charges in the case of deferred-payment agreements. 83 Ill. Adm. Code 280.110 (1985).

■ Absent a statutory or regulatory prohibition or some injury to the utilities' right to a fair return, this court cannot conclude that the Commission's failure to require IRAPP participants to pay for the cost of money is unreasonable. The very purpose of the IEAA is to assist those utility users who, through no fault of their own, are in such economic circumstances that they cannot afford to make immediate, full payment for essential utility services. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1302.) The fact that IRAPP participants are treated differently in this regard than North Shore or Peoples customers who have entered into a deferred-payment agreement does not violate the provision of the IPUA precluding discrimination among customers. As indicated by the community associations in their brief, section 9—241 of the IPUA prohibits only unreasonable discrimination. (*City of St. Charles v. Illinois Commerce Comm'n* (1961), 21 Ill. 2d 259, 264, 172 N.E.2d 353.) The utilities have failed to show that the rule is illegal, unreasonable, or injurious, and the court concludes that it is reasonable in light of the intent and purpose of the IEAA.

Central, in its appeal, raises three points urging that certain provisions of the Commission's rule exceed statutory authority or are otherwise arbitrary, unreasonable, or capricious and are therefore void. Central contends that the rule's definition of "shortfall" violates the IEAA. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304.) The IEAA section referred to reads as follows:

> "To the extent there is a difference between *payments received* from customers participating in the program and *actual amounts incurred for utility heating or electrical service rendered,* the utility shall apply all energy assistance funds received on behalf of participating customers, including Illinois Home Energy Assistance Program Funds, oil overcharge refunds to the extent allowed by federal law, relevant public aid funds and any and all other such State and federal funds which become available, to such shortfall in order to reduce or eliminate it. The cost of weatherization and conservation provisions in section 7 shall be considered in determining the shortfall." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(e).)

It is to be noted that the above provision is not a legislative definition of the word shortfall, but part of the description of the IRAPP

program which the legislature, by means of the IEAA, authorized and directed the Commission to institute.

The rule adopted by the Commission actually defines "shortfall" as follows:

> " 'Shortfall' means the difference between the billings for service after a customer qualifies for participation in the program and the customer's monthly payments due under the program. This definition pertains to individual customers, and is thus different from the shortfall referred to in Section 4(1)(e) of the Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(e))." 83 Ill. Adm. Code 281.15 (1986).

■ Central contends that under the rule's definition, a household with a monthly income of $625 that uses $100 of utility services would, under the adopted IRAPP program, have to pay only 12% of the monthly income or $75. Thus, the shortfall under the rule would be $25. Applying the statutory description, if the customer only pays $50, the shortage is $50. By excluding the difference of the amount due each winter month from the amount paid, Central argues the rule causes the shortfall to be understated contrary to the IEAA's description of the program it authorizes and directs to be instituted.

It is first noted that the IEAA provides that the difference between payments actually received from participating customers and the actual amounts incurred for utility service does not necessarily come out of the utilities' pocketbook. It is made up by available State and Federal funds. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(e).) Secondly, the only real difference between the Commission's definition of shortfall and the IEAA's description is that the Commission's definition is applied individually and over a 12-month period, rather than on a monthly billing period pursuant to the program adopted by the rule under which, during the winter months a participant has to pay at least 12% of the household's income, but during the warm months he has to pay the current bill plus 20% of any outstanding deposit. (83 Ill. Adm. Code 281.30(a)(1) (1986).) While the participant creates a shortfall (according to Central's proposition) of $50 per month in the winter, it is made up for or reduced in the nonwinter months. The net result of the Commission's implementation of the shortfall as described in Central's brief is that the shortfall provisions provide a leveling mechanism between amounts representing an initial shortfall, which amounts are first covered by public funds which must be returned later when additional payments are made by participants during nonwinter months. According to the Commission's order adopting the rule, this mechanism, although differing

from the statute, facilitates the administration of the IRAPP program and is not in substantive conflict with the IEAA.

In terms of human equation, the IRAPP participant who wants the utility's bird, "Little Bill," to arrive in the spring, had better not keep his winter nest too warm. A heavenly warm home in Illinois in the winter may mean a "hot as hell" hovel in the summer to the IRAPP participant. The rule plainly requires a participant to pay 12% of his or her household income from December 1 through April 30. It requires that during the months of May through November, the participant must pay the greater of that percentage or the current bill, plus one-fifth of any outstanding deposit. (83 Ill. Adm. Code 281.30 (1986).) That obviously means that a participant with a monthly income of $625 who uses $100 worth of utility service per month would only have to pay 12% of his monthly income ($75) during each month of the winter period, but would have to pay his current bills plus the $125 (in $25 installments for five months) still owing on the winter bills during the months of May through November. Failure to make the required payments subjects the defaulting customer to removal from the program. Accordingly, these shortfall provisions of the rule, when considered in tandem with the IEAA, do not conflict with the legislation but, in fact, reasonably implement it.

█ Central next contends that the Commission erred in limiting customer payments to public utilities to less than 12% of household income when a participant receives some utility service from a nonregulated utility (i.e., electrical cooperative or municipal utility) and some from a public utility. The IEAA's guidelines direct the Commission to establish a program whereunder a public utility customer wishing to participate in the program must:

"(i) enter into a low-income payment plan with the public utility or utilities serving the customer under which the customer agrees to pay monthly during the period December 1 through April 30, 12% of his monthly household income to the public utility or utilities which provide the customer's primary source of heat and secondary utility service and to pay monthly during the period May 1 through November 30 the greater of 12% of his monthly income or the current bill plus one-fifth of any outstanding deposit." Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(b)(i).

In response to this statutory mandate, the Commission provided that, from December 1 through April 30, a participant agrees to pay:

"(i) 12% OF HIS/HER MONTHLY HOUSEHOLD INCOME TO THE PUBLIC UTILITY WHICH PROVIDES both THE

CUSTOMER'S PRIMARY SOURCE OF HEAT AND SECONDARY UTILITY SERVICE: OR ·

(ii) 8% of his/her monthly household income to the public utility which provides the customer's primary source of heat and 4% of his/her monthly household income to the public utility which provides the customer's secondary utility service; or

(iii) 8% of his/her monthly household income to the public utility that provides the primary source of heat when the company or other person who provides the secondary utility service is not regulated by this Commission; or

(iv) 4% of his/her monthly household income to the public utility that provides the secondary utility service when the company or other person who provides the primary source of heat is not regulated by this Commission." 83 Ill. Adm. Code 281.30(a)(1)(A) (1986).

Central objects to sections 281.30(a)(1)(A)(iii) and (a)(1)(A)(iv) of the rule on the ground that the limitations of the 8% and 4% payments to public utilities when nonregulated utilities also provide service to a participant are an unwarranted extension of the authority granted to the Commission by section 4 of the IEAA. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(b)(i).) The Commission urges this court to reject Central's argument because, by limiting total customer utility payments to 12% of household income, the Commission's rule effectively, fairly and reasonably implements the legislative intent of the IEAA.

An administrative agency is created by statute and has no general or common law powers. (*City of Chicago v. Fair Employment Practices Comm'n* (1976), 65 Ill. 2d 108, 113, 357 N.E.2d 1154.) The authority of an agency must either arise from the express language of the enabling statute (here, the IEAA), or devolve by fair implication and intendment from the express provisions of the statute as an incident to achieving the objectives for which the agency was created. (*Schalz v. McHenry County Sheriff's Department Merit Comm'n* (1986), 113 Ill. 2d 198, 202-03, 497 N.E.2d 731.) In other words, the Commission has no authority except that expressly conferred upon it and is without power to extend its jurisdiction, as that is a legislative prerogative. (*City of Peoria v. Illinois Commerce Comm'n* (1985), 132 Ill. App. 3d 835, 837, 477 N.E.2d 749.) Although the Illinois Commerce Commission derives its authority and power solely from the legislature, once vested with that power, it enjoys a wide discretion to determine what the public interest requires and what measures are necessary for the protection of those interests.

*City of Chicago v. Illinois Commerce Comm'n* (1980), 79 Ill. 2d 213, 219-20, 402 N.E.2d 595.

It is apparent that the Commission's rule complies with the intent of the IEAA as expressed: "to ensure that such citizens are able to reasonably afford an essential level of heating and electric service without jeopardizing the ability of utilities to receive just compensation therefor." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1302.) The statute further states that "[s]uch program shall be consistent with the purpose[s] and objectives of this Act and the following provisions." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1).) One of these provisions requires that a participant must pay "12% of his monthly household *to the public utility or utilities* which provide the customer's primary source of heat and secondary utility service." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(b)(i).) The statutory expression "to the public utility or utilities" can be construed to mean "to the public utility or public utilities," or "to the public utility or other utilities" that provide primary or secondary utility service to a participant.

 In making decisions and determinations, administrative agencies have authority to construe statutory provisions. (*Sugden v. Department of Public Welfare* (1960), 20 Ill. 2d 119, 121, 169 N.E.2d 248.) A court is not formally bound by an agency's interpretation of the legal effect of statutory language, but it will give the agency's conclusion great weight in the court's own construction of the statute. (*Whitley v. Board of Review* (1983), 116 Ill. App. 3d 476, 478, 451 N.E.2d 942.) Furthermore, a statute should be evaluated as a whole and each provision should be construed in connection with every other section and in light of the statute's general purpose. (*Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 81, 387 N.E.2d 300.) The Commission, noting that the statute does not provide that customers receiving service from both a regulated and nonregulated utility must pay more than customers receiving service from only regulated utilities, liberally construed the statute so as to comply with the legislative intent. We agree with the Commission that the IEAA should be interpreted to mean that a customer must pay 12% of his income to the public utility or (other) utilities so as to be consistent with the expressed intent of the Act. Therefore, given the purpose of the Act, the authority granted therein, and the discretion conferred on the Commission in the exercise of that authority, we conclude that the Commission's limits set forth in sections 281.30(a)(1)(A)(iii) and (a)(1)(A)(iv) of the rule are appropriate. If the legislature had intended to have the 12% provision

limited to customers who receive their heating and electric service only from regulated sources, it could have so stated in the Act.

■■ Lastly, Central argues that the program adopted by the Commission (IRAPP) violates the IEAA (Ill. Rev. Stat. 1985, ch. 111²⁄₃, par. 1304(f)) by failing to comply with the requirement that low income customers pay for usage in excess of average residential use. This argument was also made by Peoples and North Shore, and for the preceding reasons indicated herein is without substantive merit.

This court's jurisdiction in a direct appeal from a Commission rule is limited to a determination as to whether (1) the Commission's findings are supported by substantial evidence based on the entire record; (2) the rule is within the Commission's jurisdiction; (3) the rule is in violation of the State or Federal constitutions or laws; or (4) the proceedings or manner by which the Commission promulgated its rule were in violation of the State or Federal Constitution or laws, to the appellant's prejudice. (Ill. Rev. Stat. 1985, ch. 111²⁄₃, par. 10.201(e)(iv).) Based on this limited power of review and for the reasons stated above, this court must affirm the Commission rule (83 Ill. Adm. Code 281 (1986)) adopting the IRAPP program to implement the IEAA. Ill. Rev. Stat. 1985, ch. 111²⁄₃, par. 1301 *et seq.*

The Illinois Commerce Commission's order of April 23, 1986, and its order of June 11, 1986, denying Peoples', North Shore's, and Central's application for rehearing is affirmed.

Affirmed.

SULLIVAN, P.J., and PINCHAM, J., concur.