COMMONWEALTH EDISON COMPANY *et al.*, Plaintiffs-Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

Second District   No. 2—89—0101

Opinion filed May 1, 1989.

Heidi A. Gerstman, of Hopkins & Sutter, of Chicago (Paul F. Hanzlik, of counsel), for appellant Commonwealth Edison Company.

Weil, Freiburg & Thomas, P.C., of Chicago (James P. Freiburg, of counsel), for appellant Charles T. Walneck.

Neil F. Hartigan, Attorney General, of Springfield, and Mark L. Goldstein, of Illinois Commerce Commission, of Chicago (Amy S. Botschner, Special Assistant Attorney General, and Edward P. O'Brien, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Holmstrom & Green, P.C., and Roger T. Stelle, of Kech, Mahin & Cate, both of Schaumburg (Angela P. Kline, of counsel), for appellee McHenry County Conservation District.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiffs, Commonwealth Edison Company (Edison) and Charles Walneck (Walneck), appeal from an order of the Illinois Commerce

Commission (Commission) denying the proposed conveyance of real property from Edison to Walneck. We reverse and remand.

In 1968, Edison purchased a tract of land in McHenry County consisting of approximately 98.8 acres. The property was intended to be used as a site for a proposed electrical transmission substation. In 1981, Edison determined that a portion of the property would not be needed for that purpose and attempted to sell the property to the Village of Oakwood Hills. However, the village did not express any interest in the property.

Early in 1986, Material Service Corporation (Material) expressed an interest in the property. Material wanted to use the property as a gravel pit. However, Edison did not begin any negotiations with Material. Edison determined that the gravel pit would generate large amounts of dust such that it would be impossible to maintain the electrical substation located on an adjoining parcel of property.

The McHenry County Conservation District (District) also expressed an interest in the property. The District wanted to purchase the property to preserve the natural state of the fen located on the property. A fen is described as a wetland area that has constant streams of mineralized water going into it. The District was especially concerned with the endangered and/or threatened species of flora and fauna found on the property and wanted to purchase the property to protect the species.

Edison also received notice that Walneck was interested in purchasing the property. It was Walneck's intention to develop the property by building 50 single-family residences on a 76-acre portion of the property. Walneck also expressed a strong desire in leaving the remainder of the property (approximately 22.8 acres) in its natural state.

Edison attempted to reconcile the interests of both the District and Walneck by offering a portion of the property to each party. The District rejected the offer, stating that the proposed residential development would adversely affect the wetlands area. Edison then requested sealed bids for the property. Walneck offered $165,000 and the District offered $130,000. The District also offered to clean up a portion of the property that had been used as a dumping site by local residents. Edison accepted Walneck's offer and entered into a written contract with Walneck for the sale of the property. Edison then filed a petition with the Commission seeking approval of the sale of real property to Walneck.

On September 30, 1987, a hearing was held before an examiner. The District filed a petition to intervene, which was granted. A total

of seven witnesses testified at the hearing. Edison presented three witnesses to testify as to the specifics of the proposed sale to Walneck, including the tax and accounting implications of the sale. The other four witnesses testified as to the effect the proposed sale would have on the fen.

Walneck testified that he planned to build 45 to 50 homes on the property. Each of these homes would possess well and septic systems. Walneck indicated that his proposed development would not damage the fen in any way and in fact would serve to enhance the wetlands area. However, Walneck admitted that he had no expertise in environmental matters and preferred to defer his conclusion to Marvin Frisch, the proposed developer.

Frisch testified that the housing development would enhance and lengthen the life of the fen. It was his opinion that the development would not cause any damage to the fen area. Frisch planned on designing and installing a detention-retention area to eliminate the erosion problem that had been occurring on the property. It was Frisch's opinion that by developing the property and controlling the soil erosion, the life of the fen would be lengthened.

The District also presented two witnesses at the hearing. Donald Schellhaas, the executive director of the District, testified as to the results of the field study done on the property. Schellhaas noted that approximately 20 acres of the property were used for agricultural purposes, with the fen area consisting of approximately 40 acres. The remainder of the property was a hilly, wooded area separating the fen from the agricultural area. There was a 100-foot difference in elevation between the highest and lowest points on the property.

Schellhaas also noted that the study indicated the existence of two endangered species of plant life, one threatened specie of animal life, and also discovered brook trout in the stream on the property. Schellhaas believed that the fen could be protected from the erosion problem by planting grass on the part of the property currently used for farming. It was his opinion that any development on the property could affect the existence of the endangered and/or threatened species currently living in the fen area. He further noted that the surface runoff water, coupled with the use of septic systems, could have a negative effect on the survival of the fen area.

Dr. Wayne Schennum, a biologist and the District's natural resources manager, also testified at the hearing. Dr. Schennum testified that the fen area is a very delicate ecological area that could very well be threatened by the development of a part of the property. He stated:

"It involves a lot of communities which are based on this ground water [sic]. We are worried about erosion during construction, which has been addressed by Mr. Frisch.

We don't know about that. What I heard here is possibly 76 percent of the site is going to be developed. Well, 40 percent of it is wetland. Let's say all of that was set aside. Then the problem which we are still debating is how much development can you tolerate on the up land in the ground water [sic] based wetland and still not pollute the ground water [sic] with septic systems? And that is the concern.

And other agencies like ours are trying to buy as much buffer as possible to the wetland, the up land buffer, in order to insure that that doesn't occur."

On November 6, 1987, the hearing examiner filed his proposed order to the parties. The examiner recommended that the proposed sale should be allowed, subject to certain conditions. These conditions would require the fen area to be preserved in its natural state. This would allow the public the opportunity to enjoy the fen for as long as possible. Both parties filed briefs indicating their objections to the examiner's proposed order.

On December 22, 1987, the Commission rejected the examiner's proposed order. The Commission concluded that the public would be best served by denying the sale of Edison's property to Walneck. The Commission noted that the building of 50 homes on the property would have a detrimental effect on the existence of the fen. Specifically, the Commission was concerned about the protection of the endangered and threatened species found in the fen area.

Edison filed a petition for rehearing, which was denied. The Commission granted Walneck's petition to intervene, but denied his petition for a rehearing. Both Edison and Walneck filed separate appeals, which have been consolidated for review in this opinion.

■ The District initially contends that this court is without jurisdiction to decide this appeal. Edison and Walneck originally filed this appeal in the Appellate Court for the First District. The first district, *sua sponte*, determined that it lacked subject matter jurisdiction and transferred the case to this court. We believe the transfer was proper under Supreme Court Rule 365 (107 Ill. 2d R. 365) and hold that we do have jurisdiction to decide this appeal. We also determine the appeal was timely filed.

On appeal, plaintiffs contend that the Commission erred in denying the proposed sale of real property. In particular, plaintiffs allege that (1) the Commission's order exceeded its statutory authority un-

der section 7—102 of the Public Utilities Act (Act) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 7—102); (2) the Commission's order was an impermissible taking of property without just compensation; (3) the Commission's actions amounted to an improper consent to the District's eminent domain powers; and (4) the Commission's findings were not supported by the record.

Initially, we note that section 10—201 of the Public Utilities Act (Act) governs direct appeals from orders of the Commission. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(a).) Section.10—201 provides that an order of the Commission shall be reversed only if the court determines that the order was not supported by substantial evidence, the Commission lacked jurisdiction to enter the order, or the order was in violation of the State or Federal constitution or laws. Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e); *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, 956.

The Commission's decisions are generally entitled to great deference on review, especially when the decision resolves a factual dispute. (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523; *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 438-39.) However, when the facts are not in dispute and the issue is one of law, this court is not bound by the Commission's determinations. (*Western Illinois Electrical Coop. v. Illinois Commerce Comm'n* (1979), 67 Ill. App. 3d 603, 606.) This case does not involve any factual disputes, but only the Commission's application of the law. Thus, we do not need to defer to the Commission's determination in this case.

Plaintiffs first contend that the Commission exceeded its statutory authority in denying the proposed sale of real estate. Section 7—102 of the Act provides the Commission with guidelines to determine whether a petition for the sale of real estate should be approved. Section 7—102 states that the petition should be approved if the Commission is "satisfied that such petition should reasonably be granted, and that the public will be convenienced thereby." Ill. Rev. Stat. 1987, ch. 111²/₃, par. 7—102(i); *Chicago & North Western Ry. Co. v. Illinois Commerce Comm'n* (1970), 130 Ill. App. 2d 352, 362.

Plaintiffs contend that section 7—102 of the Act must be read in conjunction with the Commission's overall purpose. The purpose and duty of the Commission is to ensure that efficient and adequate utility service is provided to the general public at a reasonable cost. (*XTRA Corp. v. Illinois Commerce Comm'n* (1987), 156 Ill. App. 3d 297, 303; *Village of Hillside v. Illinois Commerce Comm'n* (1982), 111 Ill. App.

3d 25, 31.) The Commission's powers are derived solely from the Act, and its authority is limited by the grants of the Act. *City of Chicago v. Illinois Commerce Comm'n* (1980), 79 Ill. 2d 213, 217-18.

Plaintiffs argue that the Commission exceeded its statutory authority in denying Edison's petition to sell the real estate to Walneck. While plaintiffs agree that the Commission must consider whether the proposed sale will convenience the public, they argue that the consideration must be made in a public utility service context. We agree.

■ We believe the Commission exceeded its statutory authority when it inquired into the environmental impact of the residential development on the fen. We do not agree with defendants' position that the public convenience factor applies to the public welfare in general. Instead, "public convenience" must be read in the context of the specific purpose of the Act, namely, to provide the public with efficient utility service at a reasonable cost. Our supreme court has stated that the public convenience factor, when read in the context of the Act, includes such factors as costs to customers, simplification of utility service, operating costs, facilities planning, and proximity of service territories. (*Illinois Power Co. v. Illinois Commerce Comm'n* (1986), 111 Ill. 2d 505, 512, 514.) Each of these factors specifically relates to the regulation of public utility service. As such, these factors come within the particular expertise of the Commission. Ordinarily, this court will not interfere with decisions made within the purview of the Commission's expertise. (*Illinois Power*, 111 Ill. 2d at 511.) However, we do not believe that the environmental impact of a residential development is within the particular expertise of the Commission. Had the Commission correctly determined that the sale would somehow adversely affect utility service, then we would defer to the Commission's expertise. See *Illinois Power*, 111 Ill. 2d at 514 (merger of two public utilities); *Peoples Gas Light & Coke Co. v. Illinois Commerce Comm'n* (1987), 165 Ill. App. 3d 235 (regulation of utility rates); *Albin v. Illinois Commerce Comm'n* (1980), 87 Ill. App. 3d 434 (construction of electrical transmission lines); *Knox Motor Service, Inc. v. Illinois Commerce Comm'n* (1979), 77 Ill. App. 3d 590 (regulation of trucking companies).

The Commission did not reach its decision after considering the needs in a public utility service context, but instead based its decision on the environmental impact of the proposed sale. The Commission, in its order, stated:

> "The greater public interest or convenience is a very subjective determination. On the one hand, the Commission is convinced that it has a Purchaser [Walneck] who is willing to pre-

serve the fen by installing a drainage system to inhibit storm water run off [sic] into the fen; a Purchaser who is willing to form a committee of interested parties to maintain the fen; and, a Purchaser who will provide employment during home construction and provide greater real estate tax revenues to McHenry County.

On the other hand, Intervenor [District] has shown a legitimate concern that the introduction of well and septic systems on the Property will ultimately cause a run-off [sic] of water into the fen and pollute it and adjacent preserve areas. * * *
* * *

After reviewing all the testimony and arguments of Edison and Intervenor, the Commission concludes that it is in the public interest to deny the sale of the subject property to the Purchaser. While Purchaser and Mr. Frisch have testified that every attempt will be made to save the fen, the introduction of approximately fifty residences using well and septic systems, can only have deleterious effects on the fen. The fen area has several species of flora and fauna which should be protected. The fen is unique and it is in the greater public interest to protect it from pollution, erosion and other harmful incursions."

We believe the Commission improperly relied upon the environmental implications of the proposed sale in making its final decision.

Defendants contend that *Klopf v. Illinois Commerce Comm'n* (1977), 54 Ill. App. 3d 491, supports the position that the Commission may consider the environmental implications of a proposed sale of property. In *Klopf*, a railroad public utility sought the Commission's consent to the proposed sale of a 32-mile, 100-foot wide parcel of property. The railroad wanted to sell the property to adjoining landowners. While the petition was before the Commission, the Department of Conservation (Department) expressed a renewed interest in acquiring a 19-mile section of the property. The Department wanted to use the land as a nature trail. However, the railroad informed the Department that the property had already been sold to the adjoining landowners. *Klopf*, 54 Ill. App. 3d at 494.

The Commission determined that the sale to the adjoining landowners was void because the railroad did not properly secure the Commission's approval of the sale. The Commission further held that the Department should have the opportunity to acquire the property, either by purchase or condemnation. The appellate court agreed with the Commission's decision, holding that the public would be convenienced by the sale of the property to the Department. *Klopf*, 54 Ill.

App. 3d at 499.

Defendants read *Klopf* as standing for the proposition that the public convenience factor is sufficiently broad such that the Commission may consider the proposed use of the land. Thus, it is defendants' position that *Klopf* supports the Commission's decision that the public is better served by preserving the entire parcel of property to protect the fen area. We disagree.

In *Klopf*, the Commission had two separate petitions before it. The adjoining landowners offered to pay $121,625 for 32 miles, while the Department offered $132,500 for 19 miles. (54 Ill. App. 3d at 498.) The Commission evaluated both petitions and determined that the public would be better served by approving the sale to the Department. In particular, the Commission relied on the fact that the Department offered the greater amount of money for the property. The Commission further recognized that it would not be in the public interest to require the Department to institute condemnation proceedings against each adjoining landowner. Such a procedure would result in a multiplicity of lawsuits and would not be in the public interest. 54 Ill. App. 3d at 498.

We believe that the existence of the two petitions, along with the fact that the Department offered a greater purchase price than the adjoining landowners, is what distinguishes *Klopf* from our case. In the case at bar, the Commission was not asked to decide between two competing petitions, nor was it asked to allow the District to condemn the property, but instead was asked to determine whether Edison's proposed sale to Walneck should be approved. *Klopf* does not require the Commission to consider how the property may conceivably be used, but instead to apply the public convenience standard to the specific petition(s) before the Commission. (*Village of Hillside*, 111 Ill. App. 3d at 33.) We believe the Commission improperly read *Klopf* as supporting its position that the public convenience factor allows the Commission to consider the environmental impact of a proposed sale of real property, that it could disapprove the sale on this basis, and could recommend the sale of the property to the District.

■ In addition, Walneck offered to pay a higher purchase price for the property than did the District. The Commission argues that it is entitled to reject the highest bidder if the public will be convenienced thereby. The Commission cites *XTRA Corp. v. Illinois Commerce Comm'n* (1987), 156 Ill. App. 3d 297, to support its position.

In *XTRA*, Edison entered into negotiations with XTRA to sell a 37.5-acre parcel of property. Edison was unable to reach a deal with XTRA and began negotiations with another party, Transamerica.

Transamerica agreed to Edison's asking price, and Edison petitioned the Commission for approval of the sale. XTRA was informed of Transamerica's offer and thereupon offered Edison $100,000 more than Transamerica did for the same property. Both offers were consolidated for a hearing before the Commission. *XTRA*, 156 Ill. App. 3d at 299.

The Commission determined that the sale to Transamerica was reasonable, was in the public's interest, and would convenience the public. After considering both petitions, the Commission voted to approve the sale to Transamerica. The circuit court reversed the Commission's order, holding that the Commission disregarded the public's interest in not securing the highest price for the property. (156 Ill. App. 3d at 300.) The appellate court disagreed, holding that the Commission's decision was supported by the record. (156 Ill. App. 3d at 302.) Specifically, the appellate court held that the public would be convenienced by the sale to Transamerica. The court noted that, in light of the manner in which XTRA's higher offer was made, there was no reason to disapprove the sale. 156 Ill. App. 3d at 302.

We agree with the reasoning in *XTRA* but do not believe *XTRA* applies to the facts in the case at bar. In *XTRA*, Edison chose not to sell the property to the highest bidder because the highest bid was not timely submitted. In our case, both Walneck's and the District's bids were submitted on time, and Edison chose the higher of the two. We believe Edison's conduct in both cases was proper and consistent with respect to the bidding process.

Furthermore, the Commission may reject the highest offer only if the public would be convenienced by doing so. (*XTRA*, 156 Ill. App. 3d at 302.) In our case, the Commission determined that the public would not be convenienced by the sale to Walneck, the highest bidder. Had this determination been made in a public utility service context, we would agree that the Commission could properly reject the highest offer. However, the Commission rejected Walneck's offer based on his proposed use of the property, and the potential harm such use may have on the fen.

We believe the Commission's actions in this case were well intended. It is apparent from the record that the Commission attempted to determine whether the proposed sale would benefit the general public. However, the Commission did not examine the sale in a public utility service context, but, instead, in an environmental impact context. This was beyond its authority and was therefore improper.

Our disposition of this issue makes it unnecessary for us to consider plaintiffs' other arguments on appeal. Accordingly, the order of

1012

the Commission is reversed, and this cause is remanded with directions to approve the sale to Walneck. This decision in no way affects the District's ability to institute condemnation proceedings in a proper forum should it decide to do so.

Reversed and remanded.

UNVERZAGT, P.J., and DUNN, J., concur.